MOZELLE BINGAMIN ET AL *v.* CITY OF EUREKA SPRINGS ET AL

5-4132                    408 S. W. 2d 607

Opinion delivered November 28, 1966

*M. D. Anglin,* for appellants.

*Hardy W. Croxton* and *James B. Coates,* for appellees.

CARLETON HARRIS, Chief Justice. This is an appeal in an election contest, in which, *inter alia,* the validity of certain absentee ballots is questioned.

On June 7, 1966, a special election was held in the City of Eureka Springs, at which time three different questions were submitted to the voters, but two of those questions are not involved in this appeal. The question at issue relates to a proposed bond issue under Amendment 49 to the Constitution of the State of Arkansas. On the face of the returns, the bond issue was certified by the election commissioners as having been adopted by a vote of 363 for the issue and 359 against the issue. Within proper time, Mozelle Bingamin, and others as contestants, filed an action in the Circuit Court contesting the result of the election. Among other allegations (with which we are not here concerned), appellants challenged the votes of six persons who were residents of the Municipal Hospital in Eureka Springs, and who purportedly voted by absentee ballot.[1] After hearing testimony, the court held that the six absentee votes were valid, found that the final vote was 363 for the bond issue and 359 against, and appellants' complaint was dismissed.[2] From the judgment so entered, comes this appeal.

The absentee ballots challenged were those of Mattie Rowland, Verda Cox, Alice Aimes, Jessie Dukeminier, Joe T. Nelson, and Roscoe Fowlks. During the course of the trial the Circuit Court, with the lawyers

---

[1] Other votes cast at the polling place were also challenged, but under our holding, there is no need to discuss the validity or invalidity of these ballots.

[2] The court held one vote invalid, which had been allowed by the election commission, but validated another, which had been disallowed by the election commission, leaving the same total.

and court reporter (apparently by agreement), went to the hospital and took the testimony of these voters.

Before considering this evidence, we deem it first proper to review the statutes relating to absentee voting. Ark. Stat. Ann. § 3-1125 (Repl. 1956) sets out the manner of making applications for absentee ballots, as follows:

"Applications for absentee ballots may be made in one of the following three [3] ways, *in no other manner* [emphasis supplied] and then only on the form set out in this Act [§ § 3-1123—3-1136].

(a) In person at the office of the County Clerk of the county of residence of the voter.

(b)[3] By mail; provided that, applications by mail must be received in the office of the County Clerk of the county of residence of the voter not sooner than ninety (90) days, nor later than one (1) day before the election for which such application was made. When there are first and second primaries, one (1) application may be used to request ballots for both primaries if the request is made as provided on the application form. Provided, however, that no ballot shall be mailed to any applicant except in strict compliance with the provisions of Amendment 51 to the Arkansas Constitution.

(c) By delivery of the application form to the office of the County Clerk of the county of residence of the applicant not later than 1:30 p.m. on the day of the election. *Delivery may be made only by the elector,*[4] *or the husband, wife, son, daughter, sister, brother, father or mother of the applicant.*" [Emphasis supplied.]

[3]This sub-section, originally passed with the other sections in 1949, was amended by Act 417 of 1965.

[4]The word, "elector," is somewhat confusing, and could be included by mistake; it also could have reference to the right of the voter to return his application to the clerk, and obtain a ballot at any time prior to election day. This word does not appear in § 3-1130, which deals with the manner of voting an absentee ballot.

Section 3-1126 sets out the required application form, in which the prospective voter directs the clerk to either mail a ballot to him, or to "send by (name of relative) an absentee ballot."

Section 3-1130 provides the manner in which absentee ballots must be cast, and reads as follows:

"Absentee voting may be accomplished in one of three [3] following methods, *and in no other manner* [emphasis supplied]:

(a) On ballots cast in the office of the County Clerk in the County of residence of the voter during regular business hours of any day not earlier than the fifteenth [15] day before election day, not later than 6:30 p.m. on election day.

(b) By ballot cast by mail which must be received in the office of the County Clerk of the county of residence of the voter not later than 6:30 p.m. on election day.

(c) By delivery of ballot to the office of the County Clerk of the county of residence of the voter not later than 6:30 p.m. on election day. *Delivery may be made only by the husband, wife, son, daughter, sister, father or mother of the absentee voter."* [Emphasis supplied.]

Amendment 51, Section 13, Sub-section (d), the Voter Registration Amendment, provides:

"(d) Absentee voting shall be conducted in the same manner as now provided under the laws of the State; provided, that the Permanent Registrar shall determine that the signature on the application for absentee ballot is identical with the signature appearing on the voter's Affidavit of Registration before mailing or passing out an absentee ballot. * * *"

With these provisions in mind, let us examine the testimony. The evidence reveals that the application forms were filled out for the voters in question by Ruby Bailey, Deputy Clerk, and were apparently taken by Mrs. Maxine Weaver to the Eureka Springs Municipal Hospital, where the six absentee voters in question were staying. Though the deputy clerk stated that she received requests for these ballots by mail from these six persons, none of the voters testified that they mailed in such a request. Excerpts from the testimony of several voters are herewith quoted.

From the testimony of Mattie Rowland:

"Q. Did you vote by absentee ballot where somebody brought the ballot around to you and you voted?

A. Yes, I guess I did.

Q. Who brought the ballot in here and gave it to you? The affidavit?

A. Did you, Sister?

Q. Did you put in any request for it? To anybody to send you a ballot?

A. Well, I don't know. Did I, Sister?

Q. Now, wait a minute. Did you write any letter or have any of your relatives write a letter?

A. No.

Q. Did anybody come in here and ask you to vote in that election?

A. No.

Q. Did you know there was going to be an election before the ballot was brought in?

A. No, sir, I sure didn't.

Q. Did you mark your own ballot?

A. I guess I did, didn't I Sister?"

From the testimony of Alice Aimes:

"THE COURT: I used to know you down at the Basin Park. Now, did you vote in this bond election?

A. No, sir, I didn't. I didn't vote at all. They said they was coming for me to vote. I can't go out, see. * * *

THE COURT: Did you mark a ballot, a piece of paper?

A. No.

THE COURT Was this the bond election?

A. Well, now, this was the election they had just a few days ago.

THE COURT: But now, in June, the bond election, do you remember?

A. Well, now I just don't know whether I did, or not. I wouldn't say. It's just too long ago. I remember now when they had it but I guess I did.

THE COURT: You won't say you did, or you didn't?

A. No, I won't.

THE COURT: Did you vote for the bond, or against it?

A. I voted for it if I voted at all.

THE COURT:  You voted for it?

A.  Uh-huh. If I voted at all.

THE COURT:  But you wanted to vote and you asked for a ballot and did you ask for the ballot to be brought up?

A.  No, they just brought it up to me and asked me if I wanted to vote and I said —. * * *

MR. ANGLIN:  Q.  Do you know who brought the ballot in here and gave it to you, Alice?

A.  No, in fact, I believe it come through the mail.

Q.  Did you apply for it through mail?

A.  No, Mrs. — somebody came in and signed up for all the papers. I guess she did; I don't know.''

From the testimony of Verda Cox:

THE COURT:  Did you know about this bond election they had in the City of Eureka in June?

A.  Well, the bond election for what? They've had so many. * * *

THE COURT:  You voted absentee?

A.  Well, then I was able to stand on my own two feet and vote.

THE COURT:  Did you go down June 7th and vote?

A.  I believe it was the last time that they brought me by the polling place.

> THE COURT: You think you went to the polling place?
>
> A. Well, there was a little house down here on the side of the street.
>
> THE COURT: Who took you down?
>
> A. Well, I come up with a cab driver who was coming to the hospital and I stopped off to vote."

Subsequently, the last two persons, after an extended and somewhat leading examination, finally stated that they voted absentee, though it is, we think apparent, from the quoted portions of their testimony, that these statements (that they voted absentee) can hardly be taken as completely reliable, and certainly cannot be considered substantial evidence.

Jessie Dukeminier, whose vote was likewise counted as valid, testified that she went to the polls and voted, and did not vote absentee, and the reasons for the court sustaining this vote are not apparent.

Joe Nelson, another patient in the nursing home, testified that someone at the hospital made the request for the applications; that both the applications and the ballots were brought to the hospital.

Mrs. Bailey testified that she "thought" that the applications were taken to the hospital, by Mrs. Weaver. Mrs. Weaver admitted going to the hospital, but did not say whether she took applications and ballots, or either; she stated that she had no part in voting any of the persons whose votes are here in question, was not related to any of the voters, and she did not testify that she mailed the applications or ballots to the registrar. Mrs. Bailey's testimony is very confusing. Reading it one way, it could be interpreted as stating that the absentee ballots were returned by United States

Mail. Reading it another way, it could be interpreted to mean that the applications were received by United States Mail, and actually, the evidence tends toward this interpretation. In fact, the testimony of both Mrs. Weaver and Mrs. Bailey is ambiguous, vague, and completely unsatisfactory.

Sister Mary Martina Bowles is the Administrator of the Eureka Springs Municipal Hospital. Relative to the manner in which the applications and ballots were received, Sister Bowles testified as follows:

"Q. Do you know who brought those affidavits up there to the hospital and left them there for them for absentee ballots?

A. Mrs. Maxine Weaver. * * *

Q. Who took these ballots and affidavits and gave them to the patients?

A. I did. * * *

Q. Who asked you to do it?

A. Mrs. Maxine Weaver brought the applications up and I took them to the patients and they signed them and I brought them back to her.

Q. Did you tell them what they were voting for?

A. Yes, I did."[5]

We think the quoted testimony makes clear that the statutes setting forth the manner of absentee voting were not complied with, and, in fact, the evidence, all taken together, lends itself to no logical interpretation, except that both the applications for absentee ballots, and the ballots, were handed to the voters and executed on the same occasion. This is in direct conflict with the

[5] No criticism is intended of the hospital administrator for taking these ballots and applications around, since she evidently thought she was rendering a service to her patients, and was not familiar with election laws.

requirements of Sub-section (d), Section 13, Amendment No. 51, heretofore mentioned, which provides that the permanent registrar (County Clerk) "shall determine that the signature on the application for absentee ballot is identical with the signature appearing on the voter's Affidavit of Registration *before mailing or passing out an absentee ballot.*"[6]

Suits in election contests frequently show irregularities, and Amendment 51, adopted comparatively recently by the people, contains provisions aimed at correcting this situation. It is necessary that these provisions of the amendment, and the statutes referred to, relating to the duties of voters in applying for, and casting, absentee ballots, be strictly complied with.

Here, not a single one of the six voters directly stated that he or she *first* executed an application to vote absentee. Conflicting statements were made by some of the witnesses relative to the manner in which the ballots were received. As previously pointed out, one stated positively that she voted personally at the polls; another first testified that she voted at the polls, but finally said that she voted absentee; another stated at the outset that she did not vote at all, then testified that she did not know whether she voted absentee or not, and finally, that she did. Another "guessed" that she voted, but she also testified that she did not know from whom she received the ballot, or whether she requested it; she did state that she did not know there was to be an election until the ballot was brought to her.[7] It might be added that not a single one of the six testified either that he (or she) mailed an application, or

---

[6] Emphasis supplied.

[7] While the record does not reveal the exact project for which the bond issue election was held, it is clear that it was held under the provisions of Amendment 49, which authorizes, after an election, the issuance of bonds for the purpose of securing and developing industry within or near the Municipality holding the election. It is interesting to note that two of the voters made statements whch indicated that they thought they were voting for the nursing home.

requested that one be mailed for him—or that he mailed a ballot, or requested someone to mail it for him. Nor did anyone say that he requested a relative to return an application, or ballot, to the clerk.

We hold there is no substantial evidence that the mandatory provisions of our law, herein cited, were complied with.

Reversed.