Tim A. WOMACK *v.* Phillip FOSTER

99-953                                                        8 S.W.3d 854

Supreme Court of Arkansas
Opinion delivered January 20, 2000

*Kinard, Crane & Butler, P.A.,* by: *Mike Kinard;* and *Michael W. Frey,* for appellant.

*Eugene D. Baramblett; Searcy W. Harrell, Jr.;* and *Allen P. Roberts,* for appellee.

ANNABELLE CLINTON IMBER, Justice. This is an election-contest case. A special election was held on March 9, 1999, to fill a vacancy in the office of Ouachita County Municipal Judge. No candidate received a majority of the votes cast, so a runoff election was held on March 30, 1999, between the appellant, Tim A. Womack, and the appellee, Phillip J. Foster. On the night of the election, Mr. Foster challenged over 600 absentee ballots as they were being counted. Based on Mr. Foster's challenge to the absentee ballots, the Ouachita County Election Commission threw out sixteen ballots for failure of the voters to comply with absentee voting laws. Mr. Womack made no challenges to any absentee votes as the votes were counted. Mr. Womack was declared the winner by a vote of 3,011 to 3,004, a margin of only seven votes. Not including absentee votes, the vote tally was 2,717 for Mr. Foster and 2,337 for Mr. Womack. The absentee votes added 674 to Mr. Womack's total and 287 to Mr. Foster's total. Thus, the absentee votes provided Mr. Womack with his seven-vote margin of victory. These results were certified by the Election Commission of Ouachita County on April 12, 1999.

Shortly before the runoff election, Mr. Foster had filed a petition for a writ of mandamus and declaratory judgment against

Eve Holeman in her capacity as Ouachita County Clerk, asking that the trial court order her to comply with Arkansas's absentee voting laws in the conduct of the runoff election. Specifically, Mr. Foster alleged that the county clerk had accepted absentee-ballot applications in which the applicants did not indicate a reason for voting absentee, as required by statute; and that she had also accepted applications and issued ballots to applicants who designated agents to deliver their applications to the county clerk because they were medically unable to do so themselves, but whose medical status was not verified by affidavit, as required by statute. Mr. Foster further alleged that the voter statement provided to absentee voters did not comply with the form mandated by Ark. Code Ann. § 7-5-409 (b)(4) (Supp. 1997); that the county clerk had failed to require that any person identified by the absentee voter as a designated bearer, authorized agent, or relative, sign documentation upon delivery of absentee ballots to her office; and that she had also failed to maintain any record of how many such ballots had been delivered to her office by each person so identified, as required by Ark. Code Ann. § 7-5-411(a)(2) (Supp. 1997).

At a hearing on March 29, 1999, Ms. Holeman testified that she advised applicants for absentee ballots that they did not have to indicate a reason for voting absentee. She also told her deputy clerks and employees to dispense this same advice to voters. According to her testimony, the clerk's office readily issued absentee ballots to voters knowing that they had not indicated a reason on their absentee-ballot applications. She also admitted that she failed to make sure that medical affidavits were attached to absentee-ballot applications delivered by authorized agents for persons who were medically unable to deliver their own applications to her office. Furthermore, Ms. Holeman confirmed that the voter statements provided to absentee voters by her office were not in compliance with the law. Specifically, the forms did not contain a place for the voter to appoint a designated bearer to return the ballot. Nor did it contain a place for the bearer of the ballot, either as a designated bearer, relative of the voter, or authorized agent, to sign his or her name. Finally, Ms. Holeman testified that the county clerk's office did not maintain a document signed by persons delivering absentee ballots to her office or any kind of record as to how many absentee ballots were brought to her office by a person other than the absentee voter.

The trial court granted Mr. Foster's petition for writ of mandamus on March 29, 1999, and directed the county clerk to follow the applicable statutes regarding absentee voting. However, the trial court reserved ruling on Mr. Foster's request that absentee ballots not applied for, issued by, or delivered to the county clerk in compliance with absentee voting laws, be declared null and void. Mr. Womack did not appeal the issuance of the writ of mandamus, and Mr. Foster's mandamus and declaratory-judgment action was eventually consolidated with the election contest now at issue.

Mr. Foster's election-contest complaint, which was timely filed on April 14, 1999, sought to cancel more than 600 absentee votes for Mr. Womack based on numerous instances of noncompliance with the absentee voting laws. Specifically, Mr. Foster asked the trial court to disqualify the votes of those absentee voters who did not state a reason for voting absentee on their applications and those who delivered their applications by means of an agent but failed to submit a medical affidavit. He also asked the trial court to disqualify all absentee ballots where the application or the ballot was delivered by a bearer, agent, or relative, unless the bearer signed the voter statement and a clerk-maintained record that identified the voters for whom the ballots were borne; and to disqualify all absentee ballots supported by undated applications, or applications showing only the March 9 election date, or applications altered to add the March 30 election date or the words "all elections."

Furthermore, he alleged that one voter died prior to the runoff election; four voters were not mentally competent to vote in the election; the absentee ballots of three voters were fraudulently marked by someone else; seven voters fraudulently stated on their applications for absentee ballots that they would be unavoidably absent from their polling sites on election day; and that certain conduct on the part of Mr. Womack's campaign workers was illegal and fraudulent. Exhibits attached to the complaint identified the voters whose votes were being challenged by Mr. Foster and the reasons for those challenges. Finally, Mr. Foster alleged that he would be the winner of the election if the election returns were purged of the challenged absentee ballots cast for Mr. Womack. On April 21, 1999, Mr. Womack filed a timely answer to the election-contest complaint denying each of Mr. Foster's substantive allegations of illegality or fraud. Mr. Womack also asserted in his answer that Mr. Foster's complaint represented an improper effort to disen-

franchise qualified voters, in violation of the constitution and laws of Arkansas, and in violation of the U.S. Constitution and federal civil rights and voting rights laws.

Mr. Foster filed a timely amendment to his earlier complaint on April 30, 1999. In addition to restating many of the allegations found in his original complaint, he alleged that four voters were convicted felons and not legally entitled to vote; five voters were not residents of Ouachita County and not entitled to vote; signature irregularities and forgeries were on applications and voter statements; voter-registration cards did not exist for 10 voters; 408 voters failed to state a valid reason for voting absentee on their voter statements; 116 voters, whose applications indicated the appointment of an authorized agent for medical reasons, failed to attach medical affidavits to their applications or voter statements; some voters voted absentee despite being available to vote at their polling sites on election day; and Mr. Womack's campaign workers inserted the names of bearers on absentee-ballot applications after the applicant had already signed the application.

On May 3, 1999, Mr. Womack filed a counterclaim, also alleging noncompliance with absentee voting laws. Specifically, he alleged that Mr. Foster's campaign workers made changes to the ballot materials of unidentified absentee voters after those materials had been filled out by the voters but before delivery to the court clerk; that one identified voter was paid to vote for Mr. Foster; that the ballots of three identified voters were cast by persons other than the voters, acting pursuant to powers-of-attorney; that thirty-one identified voters were nonresidents of Ouachita County and not entitled to vote; that eight ballots were delivered to the clerk by persons claiming to be relatives of identified voters, when, in fact, they were not relatives; that certain signatures of unidentified voters appeared to be forgeries; that more than five envelopes containing ballot materials were illegally delivered to a certain address; that all votes should be canceled where bearers returned more than five ballots to the county clerk; and that unidentified felons voted in the election. Mr. Womack also alleged that the county clerk disenfranchised certain unidentified voters when she refused to issue ballot materials to them because their applications for absentee ballots tendered the day before the election did not comply with absentee voting laws; and that she disenfranchised twenty-five unidentified absentee voters whose ballots were not counted

because they had not been delivered to the clerk's office until the day after the election.

Mr. Womack further challenged the Election Commission's rejection of certain absentee ballots for various reasons, including the voter's failure to attach a medical affidavit to his or her application or voter statement; the voter's married name not matching the name on the voter-registration card; the voter's failure to properly complete, sign, and tender the voter statement; and ballot stubs being lost or misplaced. Most significantly, Mr. Womack alleged in his May 3 counterclaim that the Ouachita County Election Commission violated Section 3 of Amendment 50 to the Arkansas Constitution by failing to number the ballots correctly, thus rendering all ballots used in the election untraceable. Mr. Womack restated this allegation in a motion for summary judgment filed on June 3, 1999, and further asserted that the failure to comply with the constitutional numbering requirement rendered the entire election void, thereby requiring that the results of the election be set aside. Mr. Womack filed an amended counterclaim on June 7, 1999, restating many of his earlier allegations. Additionally, he alleged various instances of illegality and fraud by Mr. Foster's campaign workers and asked that all absentee ballots handled by them be set aside and canceled. Mr. Womack also rebutted many of the earlier allegations made by Mr. Foster in his complaint and amended complaint.

A trial was held on Mr. Foster's complaint and amended complaint and Mr. Womack's counterclaim and amended counterclaim over the course of eleven days, beginning on June 8, 1999, and ending on July 21, 1999. Mr. Foster first introduced several exhibits that contained separate groups of absentee-ballot applications and voter statements in the following categories: applications and voter statements in which no reason was given for voting absentee; voter statements where "early voting" was marked as the reason for voting absentee; applications and voter statements in which medical reasons were given for voting absentee, but with no medical affidavits attached; applications that were undated; and applications with no election date or an incorrect or crossed out election date. Mr. Foster also introduced certified copies of a death certificate, a guardianship order, and circuit court records reflecting the felony convictions of four individuals.

Mr. Foster then called Sylvester Smith, Jr., to testify about his work for Mr. Womack's campaign. As part of that work, Mr. Smith delivered between 100 and 200 absentee-ballot applications to voters and urged them to vote for Mr. Womack. Mr. Smith gave the following description of how he solicited absentee votes:

> [F]or the last several years I have gotten out and tried to get people that wasn't involved in voting that was always complaining on the street, but never doing anything about it at the polls. I convinced a lot of them to register to vote and get involved in the process. After they got involved in the process, every election a lot of them flagged me down on the street wanting to continue to vote absentee, being involved in the process. Okay.
>
> I would get them a application. A lot of these people work at different places. They leave at 6:00 in the morning. A lot of them don't get home until 7:00 at night, trying to struggle to make a living for their families.
>
> Okay. I would get then a application. They would sign the application. I would explain to them up front that I could only — according to the Clerk — pick up five ballots from the Clerk's office. They would ask me, "then who would be bringing my ballot?" I'd say, "Well, I would have to find a bearer, a designated bearer to go and obtain your ballot. Do you mind?" "No. I don't mind, but I want you to bring my ballot back to me. I don't want any stranger person coming to my house or in day the [*sic*] that I don't know." A lot of these people are elderly people that I assist in voting, because they cannot get to the polls.
>
> Okay. They know up front that on these applications that I'm not going to be the bearer, that I can only get five. Okay. I asked Ms. Bevers did she know some credible people, honest people that would work to be a bearer, would they mind to go and pick up a ballot. She said she thought she could find some bearers. Okay. No one has been, you know, fooled or tricked. Up front, these people have signed these applications. They know that Sylvester Smith is going to help them obtain their ballot. They know Sylvester Smith is going to bring their ballot back to them. They know that after they vote, these ballots are going to be sealed up in front of them and either taken back to the polls by the bearer or mailed back to the Clerk's office.

During his testimony, Mr. Smith produced twenty-nine envelopes containing original ballots and original voter statements that he had

in his possession on election day, but that had not been delivered to voters.

Randall C. Ferguson, another Womack campaign worker, testified that he had helped people vote absentee for at least eight years, and that he also solicited in excess of 100 absentee votes for Mr. Womack. Mr. Ferguson's method of soliciting absentee votes was similar to that of Mr. Smith, except that Mr. Ferguson was shown on each application as the voter's authorized agent to deliver the application because the voter was medically unable to deliver the application. However, medical affidavits were not attached to any of the applications or voter statements that identified Mr. Ferguson as the voter's authorized agent. Mr. Ferguson acknowledged that on some voter statements, he was incorrectly identified as a voter's relative for purposes of delivering the ballot to the clerk's office. He also testified that he saw voters mark their ballots and sign their voter statements and that he would help voters place their ballots and voter statements in the appropriate envelopes and then seal the envelopes. Finally, Mr. Ferguson acknowledged that after he had personally delivered at least five ballots to the clerk's office, he began to mail the envelopes containing each absentee voter's ballot and voter statement back to the clerk's office.

Many absentee voters and their relatives were called to testify about numerous instances of impropriety in the absentee voting process. Several of those absentee voters testified that they could have voted at their regular polling places on election day. Some witnesses testified about the mental and physical condition of their spouses or parents who were absentee voters in the runoff election. Other witnesses testified about the status of their residency or a relative's residency in Ouachita County on the date of the election. Many witnesses testified that Mr. Smith or Mr. Ferguson assisted them or their relatives in voting absentee. For example, Mildred Ann Hill testified that she and her husband, Robert Hill, allowed Mr. Smith to mark their ballots because they did not have glasses on at the time. Grady Moore testified that he relied upon Mr. Ferguson's advice when he signed his wife's name to an application for an absentee ballot and to the voter statement, as well as when he marked her ballot. At that time, his wife was living at a nursing home and could not communicate with anyone. Gwen Ford testified that Mr. Ferguson witnessed her sign the applications for herself and her parents, Sherman Sanders and Beadie Sanders, and that

Mr. Ferguson's fellow campaign worker, Milton Cook, was present when she signed all three voter statements and marked all three ballots. At that time, her mother was a stroke patient at a nursing home.

Similarly, Sudie Jackson testified that Mr. Ferguson saw her sign voting materials for not only herself, but also for Ben Davis and her mother, Callie Murphy. Several witnesses who had designated Mr. Ferguson as their authorized agent to deliver their applications because they were medically unable to do so, testified that they picked up ballots for other absentee voters at the clerk's office and delivered them to Mr. Ferguson. Another Womack campaign worker, Nancy Kendall, solicited absentee ballots from nursing home residents. She was a designated agent for five of those residents, but did not attach medical affidavits to their applications or voter statements. She also solicited several other applications where another bearer's name was inserted.

Linda R. Taylor testified as an expert witness in the field of handwriting examination. She testified that she examined the voter applications, voter statements, and, in some instances, the voter-registration cards of many of the absentee voters who voted in the runoff election. As part of her testimony, she offered her expert opinion that it was highly probable that sixty-six absentee voters did not sign either the application, the voter statement, or both, and that the signatures on the voter statements of five absentee voters did not match the signatures on their respective applications. Ms. Taylor specifically identified those seventy-one absentee voters in a report.

After Mr. Foster concluded his presentation of testimony and evidence concerning the ballots he was challenging, the parties stipulated to the following facts: As the absentee ballots were being processed by election officials on the day of the election, Mr. Foster challenged approximately 630 of about 1000 absentee ballots. The envelopes containing each absentee ballot, along with the voter statement and ballot stub, were then segregated. The election officials rejected twenty-six ballots for various irregularities, including the absence of a voter statement, the failure of the voter to sign the voter statement, illegible signatures, or incorrect signatures or names. Approximately 332 unchallenged ballots were then set aside to be counted, and the ballot stubs were separated from those

ballots. This made it impossible to identify the persons who cast those ballots because the ballot numbers and the voter numbers appeared only on the ballot stubs. After a hearing on Mr. Foster's challenges, the Ouachita County Election Commission rejected seventeen more ballots, with one being thrown out because the stub was missing and the remaining sixteen being thrown out because the voter statements identified the reason for voting as a medical disability, but no medical affidavits were attached. The Election Commission then began to count the challenged but unrejected ballots. It was at that point that the back of each challenged ballot was marked with the ballot number printed on that ballot's stub so that each ballot could be traced to a voter.

When the recitation of the above stipulated facts was completed, the trial court ruled that Mr. Foster had made a *prima facie* showing that the ballots of 546 identified absentee voters should be set aside as not in compliance with the laws of Arkansas. The parties then stipulated that 518 of those absentee ballots were cast for Mr. Womack.

Mr. Womack then proceeded with the presentation of his case and called Ms. Holeman, the Ouachita County Clerk, as his first witness. She testified about attending regular continuing education programs for county clerks where she would receive training and information on the current status of election laws and procedures. Ms. Holeman confirmed that prior to the issuance of the writ of mandamus on March 29, 1999, her office did not verify that one of two statutory reasons for voting absentee had been declared on each application. When the application permitted delivery by an authorized agent, Ms. Holeman would only require a medical affidavit if the applicant was going to be in the hospital or a nursing home on election day. Nor would she verify whether information about the particular election was properly filled out or whether an application that indicated it could be delivered by a relative or designated bearer was in fact delivered by a relative or someone who knew the voter. However, she did keep a separate list of the names of those persons who picked up ballot materials for other voters in order to enforce the five-ballot rule.[1] She would also keep a list of the voters who

---

[1] Ballot materials included a ballot (with a ballot number printed on the back of the detachable ballot stub and the words "List of Voter's Number" printed on the front of the detachable ballot stub), ballot envelope, voter statement, and outer envelope.

were issued absentee ballots in order to avoid sending duplicate ballots to the same voters.

These policies and procedures in her office were conveyed to her clerks and to voters and campaign workers who sought guidance regarding absentee voting procedures. Ms. Holeman further testified that twenty-five ballot packages were not counted because they were received by the clerk's office the day after the election. On cross-examination, Ms. Holeman reaffirmed her earlier testimony at the mandamus hearing that the voter statement used by her office before March 29 did not comply with the law. She also confirmed that her office's previous policies on absentee voting procedures changed after the writ of mandamus. Finally, Ms. Holeman testified that voters in Ouachita County vote by paper ballot and the ballots are then tabulated by machine.

Ray Bush, a Foster campaign worker, testified by deposition about his method of soliciting absentee votes. He would take the application to the voter, get it filled out, and then take it to Mr. Foster's office where someone would make sure it had been filled out correctly. If corrections were necessary, one of the secretaries would fill in the missing items or check a box that needed to be checked. Mr. Bush would then take the application to the clerk's office, pick up a ballot, and take it to the voter. He would tell the voters how to fill out the ballot and the voter statement, place both items in the envelope, and take the envelope back to the office where the ballot and voter statement were pulled out of the envelope and checked to make sure they had been filled out properly. After making a record of how the absentee voter voted, the envelope would then be sealed and delivered to the clerk's office.

When Mr. Bush could no longer be a ballot bearer due to the five-ballot rule, he began to ask each voter not to fill in the spaces on the application or the voter statement for the bearer's name so that a bearer's name could be inserted at the office. When the bearer's name was left blank, he would drop the application off at the office, at which point someone else would take the application to the clerk's office, pick up the voter's ballot materials, and return them to the office. Mr. Bush would then go to the office and pick up those ballot materials, deliver them to the voter, and return the completed ballot materials to the office for delivery to the clerk's office by another bearer. According to a certified copy of a federal

court record introduced by Mr. Womack, a criminal judgment had been entered against Mr. Bush in 1993.

Andrea Easter testified by deposition that Herbert Thompson paid her $5 to vote for Mr. Foster. Her sister, Carla Purifoy, also testified by deposition that Mr. Thompson gave her $5, possibly to encourage her to vote for Mr. Foster; but she didn't know if she voted, much less who she voted for. Mr. Thompson testified by deposition that he was hired by Mr. Foster to take people to the polls to vote. He denied paying anyone to vote for Mr. Foster in the runoff election. He also testified that someone else signed his name on two absentee-ballot applications.

On July 26, 1999, the trial court issued its written findings of fact, conclusions of law, and judgment that invalidated 518 absentee votes for Mr. Womack and one absentee vote for Mr. Foster. Thus, Mr. Foster gained 517 votes due to the trial court's findings and was declared the winner by 510 votes. The 518 absentee votes for Mr. Womack were invalidated by the trial court for the following reasons: 495 were invalidated because the absentee-ballot applications did not indicate a reason for voting absentee; twelve were invalidated because the voters testified that they were available to vote at their polling sites on election day, despite the fact that they voted absentee; fifteen votes were invalidated because the name of the bearer was filled in by someone other than the voter after the voter had signed the application; sixty-four votes were invalidated because, according to the testimony of Mr. Foster's expert witness, Linda Taylor, those ballots were cast as a result of a forgery on either the application or the voter statement; 119 votes were invalidated for failure to attach a medical affidavit and additionally because Mr. Randall Ferguson mailed the ballots in for the voters; ten votes were invalidated because the applications either gave no reason for not voting on election day, a person was listed as a bearer after the voter signed the application, or Sylvester Smith mailed the ballot in for the voter; one was invalidated because the voter died before election day; four votes were invalidated because the voters were not residents of Ouachita County; four votes were invalidated because the voters were mentally incompetent; and four votes were invalidated because the voters were convicted felons. Many votes were thrown out for multiple reasons. The trial court reached the total number of 518 by invalidating 495 votes for not stating a reason on the absentee-ballot application for voting absentee, and by invalidat-

ing an additional twenty-three votes for some of the other reasons listed above.

With regard to Mr. Womack's argument that the entire election should be voided for failure to comply with the numbering requirement of Ark. Const. amend. 50, § 3, the trial court found that the runoff election in Ouachita County was conducted by "machine" rather than by "ballot." Thus, the trial court ruled that the numbering requirement did not apply, and there was no constitutional violation. The trial court further stated that Mr. Womack waived any argument based on the constitutional numbering requirement because Mr. Womack knew or should have known about the numbering of the ballots before the runoff election was conducted. The trial court noted also that the numbering requirement, while mandatory before the election, would only be directory after the election.

The trial court dismissed Mr. Womack's counterclaim and amended counterclaim under Ark. R. Civ. P. 12(b)(6) for failure to state sufficient facts upon which relief could be granted. According to the trial court, Mr. Womack's counterclaim and amended counterclaim did not sufficiently allege that the outcome of the election would be different if the trial court were to rule in his favor on his claims for affirmative relief. Specifically, the trial court found that in a majority of instances where voting irregularities were alleged to have occurred, the pleadings did not allege for whom the questioned votes were cast. Despite dismissing the counterclaim and amended counterclaim for failure to state a claim, the trial court proceeded to rule on the merits of each point raised by Mr. Womack and concluded that Mr. Foster's margin of victory would be reduced by 37 votes, that is to 473 votes. Thus, even when the trial court reached the merits of Mr. Womack's claims for affirmative relief, Mr. Foster remained the winner of the election.[2]

Mr. Womack now brings this appeal from the trial court's judgment and raises several assignments of error. On September 9, 1999, we granted Mr. Womack's motion to advance the appeal on the docket and establish an expedited briefing schedule. *Womack v. Foster*, 338 Ark. 514, 998 S.W.2d 737 (1999) *(per curiam)*.

---

[2] The trial court did not rule on Mr. Womack's allegations of violations of the U.S. Constitution and federal civil rights and voting rights laws.

*Section 3 of Amendment 50 to the Arkansas Constitution.*

■ For his first point on appeal, Mr. Womack argues that the Ouachita County Election Commission failed to record the voter number on any of the absentee ballots or the ballots cast on election day as required by Amendment 50, section 3, to the Arkansas Constitution, which states:

> In elections by ballot every ballot shall be numbered in the order in which it is received, the number shall be recorded by the election officers on the list of voters opposite the name of the elector who presents the ballot, and the election officers shall be sworn or affirmed not to disclose how any elector voted unless required to do so as witnesses in a judicial proceeding or a proceeding to contest an election.

Ark. Const. amend. 50, § 3 (emphasis added). The number referred to in section 3 is the "voter number," that is, the number assigned to each voter in the order of his or her appearance at the polling place, or in the case of absentee voting, in the order that each outer absentee-ballot envelope is opened and the voter's name is read aloud from his or her voter statement. Ark. Code Ann. §7-5-416 (Supp. 1997).

The trial court ruled that the runoff election in Ouachita County was by machine and not by ballot. Thus, Ark. Const. amend. 50, § 3, did not apply to that election, and voter numbers were not required to be recorded on the ballots. Mr. Womack argues that the election at issue was conducted by ballot and that the trial court erred in holding that it was by machine. The voters in this election marked ballots printed on paper with a pencil. The ballots were then fed into a machine known as the American Information Systems Machine ("AIS machine") for the purpose of tabulating the votes.

■ Two methods of voting are established by the Arkansas Constitution. Section 2 of Amendment 50 to the Arkansas Constitution states that "all elections by the people shall be by ballot or by voting machines which insure the secrecy of individual votes." As previously stated, section 3 of Amendment 50 prescribes how ballots shall be numbered in elections by ballot. Whereas, section 4 of Amendment 50 delegates to the General Assembly the power to prescribe rules in elections by voting machines: "voting machines

may be used to such extent and under such rules as may be prescribed by the General Assembly."

■ The General Assembly has enacted statutes governing election by voting machines. *See* Ark. Code Ann. §§ 7-5-501—531 (Repl. 1993 and Supp. 1999). Pursuant to Ark. Code Ann. § 7-5-501, voting machines "may be acquired and used in any election conducted in a municipality or county upon the adoption of an ordinance therefore by the governing body of the municipality or the quorum court of the county." The statutory specifications for voting machines provide that the machine must be constructed not only to perform the tabulation of votes, but the voter must also be able to perform the physical act of voting "on the machine." Ark. Code Ann. § 7-5-504 (Repl. 1993).

■ Elections by paper ballot are also the subject of certain statutory provisions. For example, Ark. Code Ann. § 7-5-208(b) (Supp. 1999) provides that "[e]ach ballot shall be printed on paper with a perforated portion capable of being detached for use as the ballot stub." At elections where paper ballots are used, the voters mark the ballot, and the votes are then calculated without the aid of a machine. Ark. Code Ann. §§ 7-5-309, 315 (Supp. 1999).

■ Sections 7-5-601—615 provide for yet another method of voting in a subchapter entitled "Electronic Voting." Section 7-5-601 states:

> The purpose of this subchapter is to authorize the use of electronic voting systems in which the voter records his votes by means of marking or punching one (1) or more vote cards, which are so designed that votes may be counted by data processing machines at one (1) or more counting places. In the enactment of this subchapter, the General Assembly recognizes that existing laws authorize the use of paper ballots or voting machines in elections of this state and that it is not the intention of this subchapter to repeal or modify any of those laws. *It is the purpose of this subchapter to establish a method of marking vote cards and tabulating election results which shall be in addition and supplemental to the existing systems of voting by paper ballot or by voting machines* as defined in Act 53 of 1963 [repealed].

*See* Ark. Code Ann. §§ 7-5-601—615 (Repl. 1993 and Supp. 1999). (emphasis added.)

We must first determine what method of voting was used in the March 30, 1999 runoff election. Ouachita County voters voted by making a mark on a printed vote card with a special pencil, much like voting was done on paper ballots in the days before any type of mechanical or electronic equipment was used. Once the voters marked their vote cards with the special pencil, the vote cards were fed into the AIS machine for tabulation. This was clearly an "electronic voting system" as described in section 7-5-601. Amendment 50, however, only recognizes elections by ballot and elections by voting machine and does not recognize elections by an "electronic voting system." Nonetheless, Mr. Womack argues that this "electronic voting system" should be considered voting by ballot because the vote cards are used for the actual voting and the AIS machine is only used for the tabulation of votes. We must therefore decide whether the Amendment 50 numbering requirement applies to electronic voting systems such as the one used in Ouachita County.

■■ Electronic voting systems merely tabulate voting cards that have been filled out by the voter in the same way that a paper ballot would be filled out. In essence, the voter is voting by paper ballot. On the other hand, when a voter uses a voting machine, the voter is actually performing the physical act of voting on the machine, and no paper ballots or voting cards are involved. Additionally, Ark. Code Ann. § 7-5-604(b) (Repl. 1993) states:

> So far as applicable, the procedures provided by law for voting by [means other than electronic voting systems] and the conduct of the election in regard thereto by the election officials, not otherwise inconsistent with this subchapter, shall apply to the system of electronic voting and tabulation as authorized in this subchapter.

We therefore hold that the electronic voting system used in the March 30, 1999 runoff election constituted an election by ballot and was subject to Amendment 50's numbering requirement. The trial court erred in holding otherwise.

We now consider whether Ouachita County's election officials complied with Amendment 50's numbering requirement. In this runoff election, the election officials placed voter numbers on the ballot stubs as they were received. Mr. Womack asserts that the ballots were not properly numbered because the Arkansas Constitution requires that the voter numbers be placed on the ballots so that

that the vote cast by a voter may be traced in an election contest.[3] The question then is whether election officials complied with Amendment 50 when they placed the voter numbers on the ballot stubs, rather than on the upper portion of the ballots. Section 3 of Amendment 50 merely states that "every *ballot* shall be numbered in the order in which it is received..." and does not specify where the number must be placed on the ballot. Mr. Womack argues that the clear intent of that constitutional provision was for the voter number to be placed on the ballot in such a way that the voter's vote could be determined if that vote were ever challenged. We agree.

The constitutional requirement of recording voter numbers on ballots began with Article 3, section 3, of the Arkansas Constitution of 1874. Perforated ballot stubs, however, were not implemented by the General Assembly until 1949. *See* Ark. Stat. Ann. § 3-818 (Repl. 1956). Prior to that time, the voter number was placed directly onto the ballot, resulting in the voter number and the voter's vote being shown on one document. Ark Stat. Ann. § 3-911 (1947). After the election, one copy of the voter list was placed in the ballot box, which was given to the County Election Commissioners. Ark. Stat. Ann. §§ 3-919, 3-1008, and 3-1013. Under this system, there was no voter secrecy because the County Election Commissioners had access to the voter list, which contained the voter's name and voter number, and the ballots that contained the voter numbers. On the other hand, election officials were able to trace votes for election-contest purposes, as was constitutionally required.

Pursuant to Act 353 of 1949, the lower one inch of each ballot had to be perforated so that it could be detached, and the ballots were to be numbered consecutively as they were printed, with the same number being placed on the lower portion of the ballot and on the upper portion of the ballot. Ark. Stat. Ann. §§ 3-818—3-819 (Repl. 1956). This number is referred to as the "ballot number." Act 353 also required that the words "List of Voters Number" followed by a blank, be printed on the lower portion of the ballot.

---

[3] Contrary to the trial court's alternative ruling, this argument was not waived by Mr. Womack prior to the election. Until the election officials placed the voter numbers on the ballots on election day, either at the polling places or when the absentee-ballot envelopes were being opened, Mr. Womack could not have known that the numbering of the ballots might not comply with Amendment 50. *See Pearson v. Henrickson*, 336 Ark. 12, 983 S.W.2d 419 (1999).

Ark. Stat. Ann. § 3-821. Under this system, election officials were able to determine how a voter voted by first looking at the voter list to find the voter's number. With that voter number, they could locate the ballot stub. The ballot number on the ballot stub would then lead them to the upper portion of a ballot which contained the same ballot number and the voter's vote. Therefore, the statutory scheme allowed for tracing, but secrecy remained questionable.

In *City of Little Rock v. Henry*, 233 Ark. 432, 345 S.W.2d 12 (1961), we held that the use of voting machines in popular elections would not satisfy the numbering requirement of Article 3, section 3, of the Arkansas Constitution, because the machines were not capable of making a record of individual votes. Amendment 50, eliminating the constitutional difficulty for voting machines, was initiated and adopted in 1962. *Walsh v. Campbell, County Judge*, 240 Ark. 1034, 405 S.W.2d 264 (1966). Although Article 3, section 3, of the 1874 Arkansas Constitution was repealed by section 1 of Amendment 50, the numbering requirement of Article 3, section 3, was readopted verbatim as section 3 of Amendment 50, along with sections 2 and 4 of Amendment 50, authorizing the use of voting machines in elections under rules prescribed by the General Assembly.

The General Assembly amended the election laws of this state in 1969 because "the present election laws are ancient and outdated in part and have caused and are causing much confusion and controversy...." Emergency Clause of Act 465 of 1969. Act 465 again provided that the lower one inch of each ballot be perforated so that it could be detached and that the words "List of Voters Number," followed by a blank, be printed on the lower portion of the ballot along with the printed ballot number. Ark. Stat. Ann. § 3-613 (b), (c), (f) (Supp. 1969). The ballot number was to be printed on the upper portion of the ballot, but it was to be covered with a black sticker that could only be removed on the order of a proper court. Ark. Stat. Ann. § 3-613 (c) and (d). This system provided for complete tracing in the case of an election contest, and also allowed for greater secrecy due to the use of a blackout sticker. Ballots were to be kept by the County Board of Election Commissioners after the election, and the stub boxes were to be kept by the County Treasurer. Ark. Stat. Ann. § 3-718. While each of these officials also had a voter list, the stubs and the ballots were separated so that secrecy was maintained.

The system established by the General Assembly in 1969 remained in effect until 1995. Act 461 of 1995 amended the subsequent codification of Ark. Stat. Ann. § 3-613, Ark. Code Ann. § 7-5-208, to provide that the ballot number be printed only on the ballot stub and not on the upper portion of the ballot. Ark. Code Ann. § 7-5-208 (Supp. 1999). Furthermore, Act 461 deleted the provision for printing the words "List of Voters number," followed by a blank. *Id.* Election officials were only required to place the voter number on the stub end of absentee ballots. *See* Ark. Code Ann. § 7-5-416 (Supp. 1997). Section 7-5-208, as amended by Act 461 of 1995, also provided that the ballots be held by the County Board of Election Officials, the stubs be held by the County Treasurer, and the voter list be filed with the County Clerk. Ark. Code Ann. § 7-5-317 (Supp. 1999). Under this system, total secrecy would be assured, but the ability to trace votes in the event of an election contest would no longer be available. This statutory scheme was in effect at the time of the runoff election in this case.

■ Although the General Assembly enacted Act 461 of 1995 to ensure total secrecy and foreclose the tracing of votes, Amendment 50 to the Arkansas Constitution still requires the numbering of ballots in elections by ballot. In *City of Little Rock v. Henry, supra,* we addressed that particular constitutional provision, albeit while it was still Article 3, section 3, to the 1874 Constitution and before it was readopted as section 3 of Amendment 50. This court's interpretation of the constitutional numbering requirement was succinctly expressed by Justice George Rose Smith in *City of Little Rock v. Henry, supra:*

> It is perfectly clear that the draftsmen of the constitution did not consider the numbering of the ballots to be a mere gesture having no practical significance. To the contrary, the matter was deemed so important that it was written into the constitution as a fundamental requirement in every election, not to be dispensed with by the legislature or by the courts.
>
> When Section 3 of Article 3 is studied as a whole the reason for the mandatory numbering of the ballots cannot be open to doubt. If the number of each ballot is recorded alongside the voter's name it becomes possible in an election contest to open the ballot box and determine how each person voted. Thus if an election should apparently be decided by a margin of ten votes and it is shown that twenty ineligible persons voted, the numbering of

> the ballots enables the courts to declare the winner with certainty. Obviously this clause in the constitution is an effective precaution against fraud and a valuable safeguard to the purity of elections.

233 Ark. at 436, 345 S.W.2d at 15. Thus, section 3 of Amendment 50 does not merely require that voter numbers be placed on the ballots or ballot stubs in a manner that would have no practical significance. Rather, the purpose of the constitution's numbering requirement in elections by ballot is to allow for the tracing of votes in the event of an election contest.

▮ With the abolition in 1995 of the statutory framework established by Act 465 of 1969 that required the printing of a ballot number on the upper and lower portions of the ballot and the insertion of the voter number on the ballot stub, there is no longer a statutory scheme that allows for the tracing of votes. Moreover, the absence of a ballot number on the upper portion of the ballot also forecloses tracing when the voter number is placed on the stub end of absentee ballots, as required by Ark. Code Ann. § 7-5-416. We therefore hold that, in the absence of a statutory scheme that allows for the tracing of votes, compliance with Amendment 50's numbering requirement in elections by ballot mandates that the voter number be placed on the upper portion of the ballot so that the purpose of that amendment may be accomplished; that is, so that in an election contest it will be possible to determine how a voter voted.

▮ With regard to the impact of this holding on secrecy, we acknowledge again, as we did in *City of Little Rock v. Henry, supra*, "that the secrecy of the ballot is better protected by the voting machine than by our traditional method of balloting, since the use of the machine prevents anyone else from ever discovering how an elector voted. But this circumstance is offset by the fact that the draftsmen of the constitution, with the knowledge available to them in 1874, chose to subordinate the secrecy of the ballot to the purity of the election." *Id.* Likewise, the drafters of Amendment 50, with the knowledge available to them in 1962, chose to continue to subordinate the secrecy of the ballot to the purity of the election in the case of elections by ballot.

▮ In this case, the ballots for the March 30, 1999 runoff election for Ouachita County Municipal Judge were printed in accordance with the statutory provisions that foreclose the tracing

of votes. That is, the ballot numbers were printed only on the ballot stubs. On the day of the election, voter numbers were only recorded on the stubs and not on the upper portion of the ballots, thus making it impossible to trace votes in an election contest. Under these circumstances, we must conclude that Amendment 50's numbering requirement was violated by Ouachita County officials.

With regard to a remedy for this constitutional violation, Mr. Womack asks this court to void the entire election. It is well settled that prior to an election, the provisions of the election laws are mandatory. *Doty v. Bettis*, 329 Ark. 120, 947 S.W.2d 743 (1997). In contrast, after the election has occurred, the provisions of the election laws are directory only. *Id. See also Swanberg v. Tart*, 300 Ark. 304, 778 S.W.2d 931 (1989). It is also well settled that the courts do not favor disenfranchising a legal voter because of the misconduct of another person, such as an election official. *Ashcraft v. Cox*, 310 Ark. 703, 839 S.W.2d 219 (1992); *Allen v. Rankin*, 269 Ark. 517, 602 S.W.2d 673 (1980). In *Spires v. Compton*, 310 Ark. 431, 837 S.W.2d 459 (1992), we reiterated the election rule that applies when the results of an election are challenged after the election:

> [T]his court has held many times that elections will not be invalidated for alleged wrongs committed unless those wrongs were such to render the result doubtful. Put in other terms, we have said that the failure to comply with the letter of the law by election officers, especially in matters over which the voter has no control, and in which no fraud is perpetrated, will not as a general rule render an election void, unless the statute expressly makes it so. In sum, the courts do not favor disenfranchising a legal voter because of the misconduct of another person.

310 Ark. at 434, 837 S.W.2d at 461 (citations omitted).

In the case at hand, both parties alleged widespread fraud and misconduct with regard to the absentee votes that were cast in the election. Of the more than 6,000 votes cast in the election, about 1,000 votes were cast by absentee ballot; whereas, over 5,000 voters cast their votes at the polls, either on election day or during the early voting period. No fraud or misconduct was alleged regarding those votes. However, Mr. Womack seeks to have the entire

election voided.[4] To void the entire election because of the misconduct of the election officials would undermine the freely expressed will of the majority of the voters. This we cannot do. *Doty v. Bettis, supra; Reichenbach v. Serio,* 309 Ark. 274, 830 S.W.2d 847 (1992).

*Failure of counterclaim and amended counterclaim to state a cause of action.*

For his second point on appeal, Mr. Womack argues that the trial court erred in dismissing his counterclaim and amended counterclaim.[5] The trial court dismissed Mr. Womack's counterclaim and amended counterclaim pursuant to Ark. R. Civ. P. 12(b)(6) for failure to state facts upon which relief can be granted. The trial court ruled that Mr. Womack did not allege that by invalidating the votes of the voters named or referenced in the pleadings that a different election result would occur; and that in a majority of instances where voting irregularities were alleged to have occurred, the pleading did not allege for whom the voter voted.

Election contests are governed entirely by statute. *Reed v. Baker,* 254 Ark. 631, 495 S.W.2d 849 (1973). As such, they are statutory or special proceedings under Ark. R. Civ. P. 81. Thus, the rules of civil procedure do not apply where a statute specifically creates a right, remedy, or proceeding that provides a different procedure. *See Rubens v. Hodges,* 310 Ark. 451, 837 S.W.2d 465 (1992).

In construing Ark. Code Ann. § 7-5-801 (d) (Repl. 1993) (and its predecessor provision), this court has held that a claim for affirmative relief in an election contest must state a *prima facie* case and plead sufficient facts to give the other party reasonable information as to the grounds of the contest. *McClendon v. McKeown,* 230 Ark. 521, 323 S.W.2d 542 (1959). The pleading must do more than merely state generalities or conclusions of law to the effect that illegal votes were cast. *Jones v. Etheridge,* 242 Ark. 907, 416 S.W.2d 306 (1967). To state a cause of action for affirmative

---

[4] We note that he does not ask this court to void all of the absentee votes, probably because Mr. Foster would clearly be the winner of the runoff election if all absentee votes were excluded.

[5] We need not address the timeliness of Mr. Womack's counterclaim as an election-contest petition because that issue has not been raised in this appeal.

relief in an election contest, one must name the voters who allegedly cast invalid ballots, allege that they voted for the other candidate, and allege that the total of the invalid votes is sufficient to change the outcome of the election. *Id.*; *Files v. Hill*, 268 Ark. 106, 594 S.W.2d 836 (1980). We recently reaffirmed these requirements for stating a claim for affirmative relief in election-contest cases. *King v. Whitfield*, 339 Ark. 176, 5 S.W.3d 21 (1999). At a minimum, the complaint for affirmative relief must include the number of votes received by each candidate, so that it appears, after subtracting the alleged invalid votes, that the claimant has more votes than his opponent. *Id.*

In this case, Mr. Womack's counterclaim and amended counterclaim made several requests for affirmative relief. Specifically, he asked the trial court to invalidate all unchallenged absentee ballots that were not marked by election officials in accordance with Amendment 50, section 3, to the Arkansas Constitution.[6] He also asked the trial court to invalidate numerous absentee ballots because of alleged fraudulent and illegal acts on the part of Mr. Foster's campaign workers in the handling of applications for absentee ballots and absentee-ballot materials. Many of these allegations failed to name the voters who allegedly cast the invalid ballots. Voters alleged to have been wrongfully disenfranchised were also not identified. Moreover, in those instances where voters were identified by name, Mr. Womack failed to allege whom they voted for in the runoff election. Without that information, we cannot conclude from the face of the counterclaim and amended counterclaim whether Mr. Womack would have had more votes than his opponent. Finally, the concluding request for relief in both the counterclaim and the amended counterclaim stated as follows:

> Upon hearing the competent evidence in this cause, the Court will come to the conclusion that more qualified, proper votes were cast for Womack than were cast for Foster.

This conclusory statement clearly fails to state a cause of action.

---

[6] Mr. Womack argues that the violation of Amendment 50 made it impossible for him to *allege* for whom the voters voted at the time he filed the counterclaim and amended counterclaim unless the votes were challenged. This argument, however, ignores the fact that at the pleading stage of an election contest, a contestant will not have access to the ballots. Only after the trial court hears the evidence and makes a determination that the ballots are invalid will the votes on those ballots be disclosed.

This case is controlled by our decision in *Wheeler v. Jones,* 239 Ark. 455, 390 S.W.2d 129 (1965), where the plaintiff omitted from his complaint which candidate benefitted from the illegal votes. Instead, the complaint set out the total votes per candidate and then asserted that 52 named persons voted in an absentee box and were not qualified electors and that 196 named persons voted in precincts in which they did not reside. The trial court sustained a demurrer, and we affirmed. We held that the complaint did not state a cause of action because the plaintiff did not allege whether the contested votes were cast for the other candidate or that the election results would be different if those votes were set aside. Likewise, Mr. Womack's counterclaim and amended counterclaim did not allege whether all of the contested votes were cast for his opponent or that, after subtracting the alleged invalid votes, he would have had more votes than his opponent.

Although Mr. Womack's counterclaim and amended counterclaim asserted numerous general and conclusory allegations of serious misconduct and fraud on the part of Mr. Foster's campaign workers, we conclude that neither pleading stated a cause of action for affirmative relief in an election contest. Thus, we affirm the trial court's dismissal of Mr. Womack's counterclaim and amended counterclaim.

*Invalidation of 495 votes for failure*
*to state a reason for voting absentee.*

Based on the allegations set forth in Mr. Fowler's complaint and amended complaint, and the testimony and evidence presented at the trial, the trial court invalidated a total of 518 absentee votes, 517 of which were votes cast for Mr. Womack. 495 of those absentee votes were invalidated because the voters did not state a reason for voting absentee on their applications for an absentee ballot. Because these 495 votes for Mr. Womack make up the majority of the votes invalidated by the trial court, we consider them first.

Arkansas Code Annotated section 7-5-402 (Supp. 1999) provides that only the following persons may cast absentee ballots: "(1) Any person who will be unavoidably absent from his voting place on the day of the election; and (2) Any person who will be

unable to attend the polls on election day because of illness or physical disability." The absentee-ballot application form provided by the county clerk and used by the voters in this case was substantially similar to the form set out in Ark. Code Ann. § 7-5-405 (Supp. 1997). On that form, each voter was asked to check one of two reasons listed in section 7-5-402 that qualify a voter to cast an absentee ballot:

Because I

___ will be unavoidably absent from my voting place on election day, OR

___ will be unable to attend the polls on election day because of illness or physical disability,

I am requesting that you provide me with the appropriate absentee ballot(s) for the following elections.

The trial court did not err when it threw out 495 votes for Mr. Womack because the voters who cast those votes failed to indicate a statutory reason for voting absentee on their absentee-ballot application. In *Roach v. Kirk*, 228 Ark. 958, 311 S.W.2d 525 (1958), we held that a voter who failed to state a reason for being absent from the polls on his absentee-ballot application was disqualified from voting absentee. Likewise, in this case, the failure of 495 voters to indicate a statutory reason for voting absentee on their absentee-ballot applications disqualified them from casting absentee ballots.

Mr. Womack argues that even though these voters may have violated our election laws by not indicating a reason for voting absentee on their absentee-ballot applications, their votes should not be invalidated for such "technical failures." We disagree. We have held that there must be strict compliance with statutory provisions regarding the application for and casting of absentee ballots, even if the challenge is brought after the election has occurred. *Bingham v. City of Eureka Springs*, 241 Ark. 477, 408 S.W.2d 607 (1966). *See also Martin v. Hefley*, 259 Ark. 484, 533 S.W.2d 521 (1976); *Phillips v. Melton*, 222 Ark. 162, 257 S.W.2d 931 (1953); *Logan v. Moody*, 219 Ark. 697, 244 S.W.2d 499 (1952). Furthermore, there is no merit to the argument that these absentee votes should not be invalidated because voters filled out their absentee-ballot applications based upon incorrect advice given by the county

clerk's office. The absentee-ballot application form provided to each voter in this case was clear and accurate. Nothing on that form prevented a voter from knowing what information was being requested, or from properly inserting the requested information on the form.

Because we have determined that the trial court correctly invalidated 495 votes cast for Mr. Womack, only twenty-three votes remain at issue. Many of those votes were invalidated by the trial court for several reasons. We will now address various other reasons given by the trial court to invalidate votes cast for Mr. Womack.

*Invalidation of 119 absentee votes for failure to attach medical affidavits.*

The trial court also declared 119 votes cast in favor of Mr. Womack to be invalid because the absentee voters failed to attach medical affidavits to their absentee-ballot application forms. The trial court relied on Ark. Code Ann. § 7-5-405 (Supp. 1997) in ruling that the attachment of medical affidavits to absentee-ballot application forms was mandatory in certain circumstances. Mr. Womack contends that medical affidavits were not required. We disagree.

As previously stated, the absentee-ballot application form provided by the county clerk and used by the voters in this case was substantially similar to the form set out in Ark. Code Ann. § 7-5-405 (Supp. 1997). On that form, each voter must indicate one of five methods listed in section 7-5-405 for delivering the absentee-ballot application to the county clerk:

I am delivering this application by: [please check which one]

_____ personally delivering this application.

_____ mailing this application.

_____ authorizing my relative or designated bearer, (please insert name) _____, to deliver this application.

_____ *authorizing (please insert name) _____ as my agent, to deliver this application, as I am medically unable to deliver it. An affidavit verifying my medical status as unable to*

> *deliver the application or to vote on the day of the election is attached.*

> ___ I am transmitting a signed facsimile of this application by facsimile machine transmission over telephone lines to the office of the county clerk.

(Emphasis added.)

■■ ■■ The plain language of section 7-5-405 and the absentee-ballot application form indicate that an affidavit verifying the voter's medical status is required when the absentee voter authorizes an agent to deliver his or her application to the county clerk. On the other hand, if the absentee voter chooses any of the other four methods for delivering the absentee-ballot application, a medical affidavit is not required by section 7-5-405. This interpretation is supported by Ark. Code Ann. § 7-5-403 (a)(2)(A) (Supp. 1997), which specifically lists the only ways that an application for absentee ballot may be delivered to the county clerk when the form prescribed in section 7-5-405 is used:

> (2) Delivery of the request for an absentee ballot to the county clerk may be made in one (1) of the following ways, and in no other manner:

> (A) For applications submitted using the form prescribed in § 7-5-405:

> (i) In person at the office of the county clerk . . .

> (ii) Applications by mail . . .

> (iii) A designated bearer may deliver the completed application to the office of the county clerk . . .

> (iv)(a) A person declared as the authorized agent of the applicant may deliver the application to the office of the county clerk . . .

> *(b) An authorized agent must submit to the county clerk an affidavit of the administrative head of a hospital or nursing home located in this state that the applicant is a patient of the hospital or nursing home and is thereby unable to vote on the election day at his or her regular polling site.*

> *(c) A copy of the affidavit shall be retained by the county clerk as an attachment to the application for an absentee ballot;*

(v)(a) An application for absentee ballot may be requested by facsimile machine transmission . . .

(b)(1) The completed facsimile-transmitted application must be received in the office of the county clerk . . . .

Thus, a medical affidavit is required only when the voter delivers the application by means of an authorized agent. Furthermore, in order to utilize that manner of delivery, the voter must be in a hospital or nursing home. Ark. Code Ann. § 7-5-403 (a)(2)(A)(iv).

■ The record in this case indicates that for all 119 absentee votes invalidated by the trial court, the voters indicated on their absentee-ballot applications that their applications would be delivered to the clerk by authorized agents. However, each of those voters failed to attach the required medical affidavit, notwithstanding the fact that such a requirement was clearly stated on the absentee-ballot application form. We reiterate once again that strict compliance with absentee voting laws is required under these circumstances. *Bingham v. City of Eureka Springs, supra.* Therefore, we hold that the trial court correctly invalidated 119 absentee votes cast in favor of Mr. Womack because the voters failed to attach medical affidavits to their absentee-ballot application forms.

*Invalidation of four votes based on mental incompetency.*

■■ The trial court found that four absentee voters were incompetent and declared that their votes were invalid. Article 3, section 5, of the Arkansas Constitution states that "[n]o idiot or insane person shall be entitled to the privileges of an elector." Also, Amendment 51, section 11(a)(6), states that the registration of voters who have been adjudged mentally incompetent by a court of competent jurisdiction shall be canceled. Mr. Womack argues that there was insufficient evidence of incompetence to support the trial court's invalidation of these four votes. When a case is tried by a circuit court sitting without a jury, our inquiry on appeal is not whether there is substantial evidence to support the factual findings of the court, but whether the findings are clearly erroneous, or clearly against the preponderance of the evidence. *Springdale Winnelson Co. v. Rakes,* 337 Ark. 154, 987 S.W.2d 690 (1999); *Arkansas Dep't of Human Servs. v. Spears,* 311 Ark. 96, 841 S.W.2d 624 (1992). In reviewing the findings of fact by a trial court, we consider the

evidence and all reasonable inferences therefrom in a light most favorable to the appellee. *Jernigan v. Cash*, 298 Ark. 347, 767 S.W.2d 517 (1989).

Robert McKoin's vote was invalidated after the trial court heard testimony that he suffered from Alzheimer's disease and dementia and had no short-term memory. Beadie Sanders's vote was disqualified upon testimony that she was a severe stroke victim and could not walk or talk, was unaware of her surroundings, and had no awareness of the election. Merdis Moore's vote was disqualified due to evidence that she was afflicted with Alzheimer's disease and was unable to communicate or mark her own ballot. With regard to the competency of Annie Dempsey, the Ouachita County Probate Court entered an order on January 6, 1999, appointing a guardian for her because it found that she was "senile, and her intellectual capacity, ability to reason, and emotional status are markedly impaired to the point where she is no longer able to make decisions for herself."

Mr. Womack first argues that the appointment of a guardian does not mean that Annie Dempsey is incompetent. Incapacitated persons for whom a guardian is appointed are not presumed to be incompetent. Ark. Code Ann. § 28-65-106. However, the probate court made specific findings that Ms. Dempsey was incompetent. Thus, the trial court's finding of incompetency in this case was not based on a presumption. Mr. Womack also cites *Sparks v. First National Bank*, 242 Ark. 435, 413 S.W.2d 865 (1967), for the proposition that professional evidence is required in order for the court to find that someone is incompetent. The holding in that case is inapposite because it dealt with a statutory requirement in guardianship proceedings. Based upon the evidence noted above, we conclude that the findings of the trial court are not clearly erroneous.

*Invalidation of four votes based on felony convictions.*

The trial court invalidated the votes of four absentee voters because they were convicted felons. Amendment 51, section 11(a)(4), of the Arkansas Constitution, states that it is the duty of the registrar to cancel the registration of voters "who have been convicted of felonies and have not discharged their sentence or

been pardoned." Mr. Foster had the burden of proving that convicted felons voted in the election. *City of Newport v. Smith*, 236 Ark. 626, 367 S.W.2d 742 (1963). As previously mentioned, he introduced certified copies of the criminal judgments and commitment orders entered against four individuals, thereby disqualifying them as voters.

Mr. Womack contends on appeal that there was no proof that the individuals whose criminal records were introduced actually voted in the election by absentee ballot. However, as Mr. Foster points out, such evidence was introduced and it was sufficient. For each of these individuals, Mr. Foster introduced evidence showing that the birth date or address on the individual's absentee-ballot application or voter statement matched the birth date or address on the criminal records. The name on each individual's absentee-ballot application or voter statement also matched the name on his or her criminal record.

Once again, when a case is tried by a circuit court sitting as a jury, our inquiry on appeal is whether the findings are clearly erroneous, or clearly against the preponderance of the evidence. *Springdale Winnelson Co. v. Raker, supra.* There was abundant evidence from which the trial court could find that these four felons voted absentee. We conclude that the trial court's findings in that regard are not clearly erroneous.

Next, Mr. Womack argues that proof of a felony conviction alone is not sufficient to invalidate the votes. Amendment 51, section 11, requires the circuit clerk, upon the conviction of any person of a felony, to notify the registrar. The registrar then has a duty to cancel that voter's registration and notify the voter. Mr. Womack asserts that this process was not followed for these four voters, and as a result, they were still qualified to vote despite being felons. Specifically, he argues that "any individual is permitted to continue voting until his name is removed from the registration rolls and he is notified by the clerk of such action." However, Mr. Womack cites no authority in support of this argument. We have said on numerous occasions that we will not consider the merits of an argument if the appellant fails to cite any convincing legal authority in support of that argument. *Ellis v. Price*, 337 Ark. 542, 990 S.W.2d 543 (1999); *Craft v. City of Fort Smith*, 335 Ark. 417, 984 S.W.2d 22 (1998). Mr. Womack's failure to cite authority or

make a convincing argument is sufficient reason for affirmance of the trial court's ruling on this point. *Williams v. Martin*, 335 Ark. 163, 980 S.W.2d 248 (1998). It is certainly not apparent without further research that this argument is well-taken. *Id.*

Finally, Mr. Womack contends that Sheree Jenkins had completed her sentence at the time of the election and, thus, was able to vote. A felon who has discharged his or her sentence is able to vote. Arkansas Constitution, Amendment 5, section 11. We cannot say that Ms. Jenkins had discharged her sentence at the time of the election. The judgment and commitment order reflects that she was sentenced to the Arkansas Department of Correction on July 29, 1992, and that the circuit court suspended imposition of any additional sentence for a period of five years. We, therefore, conclude that it was not error for the trial court to invalidate the votes of four absentee voters because they were convicted felons.

*Invalidation of three votes based on nonresidency.*

The trial court invalidated the votes of four absentee voters because they were nonresidents of Ouachita County at the time their votes were cast. Mr. Womack argues that the trial court erred in canceling three of these votes. Specifically, he asserts that Franklin A. Gaston, Jr., Neva Jo Gaston, and Kelly Kendall intended to claim Ouachita County as their residence.

Arkansas Code Annotated § 7-5-201 (Supp. 1997) provides that:

(a) . . . The person shall be eligible to vote only in the county in which he resides on the date thirty-one (31) calendar days prior to the election, unless specifically exempted under § 7-5-406.

(b) Residency shall generally be that place where one lives and works for a period of time, notwithstanding that there may be an intent to move or return at some future date to another place. Persons who are temporarily living in a particular place because of a temporary work-related assignment or duty post, or as a result of their performing duties in connection with their status as military personnel, students, or office holders, shall be deemed residents of that place where they establish their home prior to beginning such assignments or duties.

(c) No person may be qualified to vote in more than one (1) precinct of any county at any one (1) time.

We have previously stated that there are two factors to consider in resolving the validity of voting residence. *Pike Co. Sch. Dist. v. Pike Co. Ed. Bd.*, 247 Ark. 9, 444 S.W.2d 72 (1969). First, we look at the intent of the voter with respect to residency. *Id.* Second, the conduct of the voter must be reasonably consistent with his or her asserted residency. *Id.* This is a question of fact. Accordingly, we will affirm the trial court's findings unless they are clearly erroneous, giving due regard to the opportunity of the trial court to judge the credibility of witnesses. *Springdale Winnelson Co. v. Rakes, supra.*

There was testimony at the trial that Franklin A. Gaston, Jr., and Neva Jo Gaston sold their house in Ouachita County and moved to Garland County in August 1998. They had no plans to move back to Ouachita County. However, Mr. Gaston continued to work four days each month in Ouachita County. He also owned property in Ouachita County. There was also testimony that Kelly Kendall moved to Little Rock in June 1998, where she maintained her own apartment and worked five days a week. Her employment was considered to be on a trial basis, until such time as she proved her worth and was awarded a permanent position. She continued to assess her personal property in Ouachita County, receive mail there, and maintain phone service there. In view of this testimony, we cannot say that the findings of the trial court on residency are clearly erroneous. Nor can we say that the trial court erred in invalidating the votes of four absentee voters because of their non-residency in Ouachita County at the time of the election.

In affirming the trial court's judgment in this case, we also note our agreement with the following conclusions expressed by the trial court in its findings of fact, conclusions of law, and judgment:

> The laws dealing with absentee voting have a very obvious purpose, and they cannot be ignored by the unscrupulous campaign worker, the County Clerk's office, or the Secretary of State. It borders on the absurd for anyone to assume that absentee voting and "early" voting should be governed by the same rules. "Early" voting does nothing more than offer the voter the opportunity to do early what he or she would otherwise do on election day: Go vote in person. It offers no additional opportunity for fraud. On

the other hand, absentee voting offers all sorts of opportunity for fraud, as was so vividly seen in this election. This can be no better illustrated than Sylvester Smith carrying around 30 unmarked absentee ballots, looking for the persons whom they were intended. Both election laws and criminal laws were violated in this election, none of which would have been possible had a strict adherence to the clear requirements of the statute been demanded. Ignoring the law by those chosen to enforce it, or even slack enforcement by those persons, invariably brings on increased violations — and the innocent voter suffers.

In all fairness, had the entire absentee box been challenged by the two contestants, as plaintiff offered to do on election night but which defendant was unwilling to do, the vast majority of all the absentee voters would have been invalidated. That's how widespread the abuse of the process was. While Sylvester Smith and Randall Ferguson were the most obvious and most active abusers, both sides are guilty, if not in a criminal sense, certainly in a practical sense. Both sides took advantage of the fact that the law wasn't being enforced, the defendant far more than the plaintiff. Without doubt, had the entire box been challenged, the ultimate result would have been the same, Foster would have won, but at least each voter could have been told why his or her ballot was invalid. Nevertheless, it is this court's hope that the next election will see every voter go to the polls in person on election day, vote early, or cast a valid absentee ballot which expresses the choice of the voter, not some vote hustler; that those charged with enforcing the election rules will do so; that those intent on abusing the rules will know that they will not succeed and that there is a price to pay for those trying.

Affirmed.

ARNOLD, C.J., BROWN, J., and SPECIAL JUSTICE BUD CUMMINS concur.

SPECIAL JUSTICE WALTER SKELTON joins the majority.

CORBIN and THORNTON, JJ., not participating.

ROBERT L. BROWN, Justice, concurring. The majority opinion places Womack in an untenable position in one respect. He was the certified winner of the election and had no incentive to challenge the results until after Foster filed his complaint. Then Womack filed his counterclaim. By that time the stubs had been torn from the ballots, and there was no way for him to

trace the ballots to particular voters he wished to challenge, short of subpoenaing each voter into court to testify under oath. Thus, there was no way to know whether a voter he contended was involved had cast a vote for Foster or for Womack. This, as the majority accurately points out, was due to the Election Commission's clerical foul-up and to the failure to comply with Section 3 of Amendment 50 by correctly numbering the ballots.

Despite this electoral rat's nest, the majority still would require Womack to allege the names of invalid voters and assert in his complaint how the election results would be different without their votes. I question the logic of this. Clearly, Womack would be hard pressed to ever prove a different election result when the ability to trace a ballot to a voter has been effectively removed due to the defective ballots.

In short, it seems that Womack's task in making a *prima facie* case in his counterclaim, as Ark. Code Ann. § 7-5-802 (Repl. 1993) requires, has been made immeasurably more difficult by the ballot-numbering snafu. I would not penalize him, under these circumstances, by affirming the dismissal of his counterclaim. However, I would void the entire absentee box due to the numbering error. This would mean that Foster still prevails.

Voiding the absentee box is appealing because that is exactly what the trial judge wanted to do. The judge specifically referred to widespread abuse by both candidates in connection with absentee voters and in effect pronounced "a pox on both your houses." He begged off in voiding the absentee box because the parties did not ask for that precise relief, though both parties prayed that illegal ballots not be counted. Pervasive abuse warrants such a remedy in my judgment. For that reason, I concur in the result.

ARNOLD, C.J., joins.

SPECIAL ASSOCIATE JUSTICE H.E. CUMMINS joins.