Richard L. MAYS *v.* James NEAL, Executive Director of the
Supreme Court Committee on Professional Conduct

96-690                                              938 S.W.2d 830

Supreme Court of Arkansas
Opinion delivered February 17, 1997

*Darrell F. Brown & Associates, P.A.*, by: *Darrell F. Brown* and *Bowden Law Firm*, by: *David O. Bowden*, for appellant.

*Claibourne W. Patty, Jr.*, for appellee.

TOM GLAZE, Justice. Appellant Richard L. Mays brings this appeal from the appellee Supreme Court Professional Conduct Committee's reprimand sanction, having found Mays violated Rules 1.4(b) and 5.5(b) of the Model Rules of Professional Conduct. Rule 1.4(b) directs that a lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed

decisions regarding the representation. Rule 5.5(b) prohibits a lawyer from assisting a person who is not a member of the bar in the performance of activity that constitutes the unauthorized practice of law.

This dispute arose after Mays's law firm, Mays & Crutcher, P.A., undertook to represent Vanessa Conley, who on July 18, 1994, was involved in a motor vehicle accident in Little Rock. The other vehicle involved in the accident was a rental car, which was insured by Empire Insurance Company. At the scene of the accident, a man, later known to be Tim Mason, approached Conley, asking her who caused the accident. Conley said that Mason identified himself as an investigator, and suggested Conley needed legal representation. This interchange resulted in Conley signing a contract employing Mays as her attorney. Mason gave Conley a business card bearing the name of Catherine Stevens and instructed Conley that Stevens was the person Conley should call.[1] Stevens later sent a copy of Conley's contract to Empire, along with her business card.

Conley said that, on July 19, 1994, Stevens called Conley's home and spoke with her husband, and Conley says she returned the call on July 20, 1994. Conley claims that, during her conversation with Stevens, Stevens referred her to the Price Chiropractic Clinic.[2] Conley was subsequently treated by the Price Clinic from about July 25, 1994, to October 21, 1994. In November 1994, negotiations to settle Conley's claim took place between Stevens and Chuck Traylor, who was the claims adjuster with Empire Insurance Co. Some confusion and differences occurred between Stevens and Conley over the method and amount of payment Conley would approve before reaching any settlement. Conley also expressed that, although she had been released by the Price Clinic, she was still having pain and needed to see another doctor. Conley became dissatisfied with the manner in which her

---

[1] The business card reflected the Mays & Crutcher Law Offices and showed Catherine Stevens as "Senior Claims Manager."

[2] Stevens testified that she never called Conley on July 19, and that she never gave Conley only the Price Clinic's name, since it was Mays's practice to suggest several physicians' names and allow the client to choose.

case was being handled, and on November 30, 1994, she went to Mays's office to retrieve her file. While Stevens retained possession of Conley's file because Mays was not present, it is clear the Mays-Conley relationship had been severed by December 6, 1994 — the date Stevens had notified Empire Insurance by letter (with a copy to Conley) that Mays no longer represented Conley. The letter also reflected that Conley had rejected Empire's $9,000.00 offer to settle, but Mays had retained an attorney's lien on any proceeds to be paid Conley in the future. Conley later claimed she had been unaware of any $9,000.00 offer until she received a copy of the December 6 letter.

Conley subsequently pursued her claim without the assistance of an attorney, and sought information from Empire Insurance by writing that Company on March 26, 1995. Empire's adjuster, Traylor, responded, indicating that he had not received the December 6 letter written by Mays, that he had already settled Conley's claim by having spoken with "Jim," who was with Mays's firm, and that Conley would have to obtain a letter reflecting Mays no longer represented her. In May of 1995, Conley forwarded to Traylor a copy of Mays's earlier December 6 letter, and informed Traylor that she had since contacted the Supreme Court Professional Conduct Committee and complained about Mays's representation. She further asked Traylor for a copy of the $9,000.00 check dated November 30, 1994, which purportedly had been sent to Mays in settlement of her claim. Upon receipt of Conley's May 1995 letter, Traylor sent Conley another letter, wherein he forwarded her a copy of the $9,000.00 check. The check had never been cashed. In August of 1995, Conley filed her formal complaint against Mays with the Professional Conduct Committee, alleging eight violations of the Model Rules of Professional Conduct, two of which the Committee eventually found meritorious. Besides complaining to the Committee about her initial confusion concerning the manner in which Mays established his contractual relationship with Conley, she also complained he failed to communicate and keep her informed concerning the law firm's negotiations with Empire Insurance Company in her behalf.

Mays first controverts Conley's complaints by raising several procedural points. None has merit. Mays initially argues this court's Committee on the Unauthorized Practice of Law (CUPL) has prerequisite jurisdiction of this matter because its Rule III provides in part that "*all* inquiries and complaints relating to the unauthorized practice of law *shall* be directed to the Committee on the Unauthorized Practice of Law." He further argues that, because Rule 5.5(b) of the Model Rules of Professional Conduct prohibits a lawyer from assisting a person who is not a member of the bar in performing the unauthorized practice of law, Conley was required first to get CUPL to determine what is or is not "the unauthorized practice of law." We disagree. Nothing in either committee's rules reflect that CUPL's rules in any way preempted the Model Rules of Professional Conduct. As is obvious from reading them, the Model Rules deal only with the activities of licensed lawyers, whereas CUPL's rules are intended to prevent non-lawyers from practicing law.

As this court has recognized earlier, it derives its power through Amendment 28 to the Arkansas Constitution to establish and maintain, through its Committee on Professional Conduct, jurisdiction over a lawyer's person by virtue of the issuance of his license to practice law. *McCullough v. Neal*, 314 Ark. 372, 862 S.W.2d 279 (1993). Here, Conley's complaints were not directed against Stevens or other employees of Mays's law firm; they were filed against Mays, who is subject to this court's jurisdiction by virtue of his status as a licensed attorney. Consequently, by filing her complaints against Mays, the Professional Conduct Committee, through this court's supervisory authority, has subject matter jurisdiction to consider those issues that fall within the parameters of the Model Rules.

Mays's other procedural attacks question the validity of the Professional Conduct Committee's hearing and involve his assertion that the Committee had improperly placed the burden of proof on him. Neither argument has merit.

Conley, Mays, and other witnesses filed affidavits with the Committee, and the Committee later set what it designated as an evidentiary hearing on January 19, 1996. During the hearing,

Mays's counsel questioned the nature of the hearing, and asked the Committee how it intended to proceed. Counsel advised Committee members that Mays was present and ready to offer evidence and stated Mays wanted the Committee to make its decision at the hearing's end. The Committee agreed to consider the hearing to be one on the merits and to decide the case at the end of the evidence. After thoroughly discussing confidentiality issues and the *de novo* nature of the Committee's hearing as addressed in its rules, Mays's counsel withdrew any comments he had made relative to what would happen after the Committee voted and ruled in Mays's case.

■ Our review of the record reflects that Mays was prepared to present his case on the merits on January 19, 1996, and the Committee conceded that point to him. And while he mentions in his brief on appeal that he did not have his "office file" with him at the hearing, Mays fails to submit or argue that he had been prevented from introducing any relevant evidence. In fact, he vigorously contested the allegations offered against him. Because Mays received the relief he asked of the Committee (for it to decide the case at the hearing's end), and he shows no prejudice in having proceeded, we hold the Committee's hearing and action were valid. *See Mikel v. Hubbard,* 317 Ark. 125, 879 S.W.2d 558 (1994).

■ Mays's third procedural argument is based upon two references made by the Committee in its written decision of March 27, 1996. One, the Committee mentioned that no evidence had been offered as to how Conley had initially come into contact with Tim Mason. In addition, he points out the Committee's letter opinion also noted that, while Mays had testified that an attorney at his firm always decides whether to accept a case, Mays was unable to say which attorney accepted Conley's case since Mays had not brought his office file to the January 19 hearing. Mays urges these Committee references reflected that it had impermissibly shifted the burden of proof to Mays and to do so was error. Our short answer to this procedural claim is that Mays never raised it before the Committee. Instead, the Committee willingly proceeded with the January 19 hearing and Mays, himself, explained Mason's involvement as well as the office procedure

his law firm utilized in accepting cases. Besides, considering all the evidence submitted to the Committee, we find these two suggested evidentiary findings in the Committee's opinion letter to be harmless. Suffice it to say, the Committee proceeded with its case on January 19, 1996, by calling its six subpoenaed witnesses and introducing its other evidence, and, as discussed more fully hereafter, we believe the Committee fully met its burden of proof. In this respect, we now turn to the merits of Mays's last argument.

■ In considering Mays's argument that the evidence is insufficient to support the Committee's granting a reprimand in this case, we first set out our standard of review that appeals from any action by the Committee shall be heard *de novo* on the record, and this court shall pronounce such judgment as in its opinion should have been pronounced below. *Finch v. Neal*, 316 Ark. 530, 873 S.W.2d 519 (1994). This court affirms the Committee's action unless it is clearly against the preponderance of the evidence, and will not reverse its findings unless they were clearly erroneous. Here, in reaching its decision, the Committee recited considerable evidence, but failed to set out its findings. We reiterate what we said in *Finch* — while the Committee is not required to set out its findings, it would have been appropriate and most helpful if it had done so. *Id.* at 536, 537. However, while no findings were required, made, or requested in this matter, we will review this case on its record and pronounce such judgment as in our opinion should have been pronounced below.

We first address the Committee's decision that Mays violated Rule 1.4(b) by failing to communicate properly with his client, Conley. Rule 1.4(b) provides, "[A] lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." Adequacy of communication depends in part on the kind of advice or assistance involved. *See* Comment to Rule 1.4(b). The Comment further offers the example that, in negotiations where there is time to explain a proposal, the lawyer should review all important provisions with the client before proceeding to an agreement.

■ In the present case, such a review did not happen. In fact, from the beginning, there is proof that Mays's law firm failed

to explain its contract with Conley or make clear early in the employment relationship the objectives of that legal representation. While Mays testified that he initially tries to make contact with his clients, he conceded that he never met with Conley or spoke to her by telephone. Mays further conceded that Conley's only contact with his firm was through his staff, and Stevens admitted that she had worked on Conley's case before Mays knew Conley was a client. In addition, Conley averred that her only contact with the firm was through Stevens even though, on several occasions, Conley had asked for an appointment with Mays. Each time Conley was told she should communicate with Stevens. In sum, although Mays and Stevens both related that Mays had instructed Stevens how Conley's case should be settled, the evidence is undisputed that Conley was afforded no opportunity to communicate directly with Mays and to ask him questions about her case. Obviously, the record supports the view that Mays had relied entirely upon his non-lawyer staff member to communicate with Conley even though Conley had posed questions concerning her legal representation, and was denied the opportunity to resolve those questions by meeting with him.

We next address Mays's argument that the evidence is insufficient to support the Committee's finding that he violated Rule 5.5(b) by assisting a person who is not a member of the bar to perform the unauthorized practice of the law. Again, it is helpful to our discussion to allude to the applicable comment to this model rule which in relevant part provides:

> Paragraph (b) [of Rule 5.5] does not prohibit a lawyer from employing the services of paraprofessionals and delegating functions to them, so long as the lawyer supervises the delegated work and retains responsibility for their work.

Rule 5.3(b) further provides that a lawyer having direct supervisory authority over the non-lawyer shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer. In this respect, a lawyer should give such assistants instruction and supervision concerning the ethical aspects of their employment.

■ The significance and meaning of Rules 5.3(b) and 5.5(b) become obvious when considered in light of this court's decision in *Undem v. State Board of Law Examiners*, 266 Ark. 683, 587 S.W.2d 563 (1979), where the court discussed, as follows, what is meant and is included within the practice of law and why those matters are limited to performance by licensed lawyers:

> This [prohibition] is not only to ensure professional competence, but is in the public interest, to ensure that the public be not led to rely upon the counseling, in matters of law, by those who are not answerable to the courts in this state for the manner in which they meet their professional obligations by compliance with standards of professional conduct imposed upon those engaging in the practice of law.

From the foregoing rules and principles, it is clear that, while a lawyer may delegate certain tasks to his assistants, he or she, as supervising attorney, has the ultimate responsibility for compliance by the non-lawyer with the applicable provisions of the Model Rules. In reviewing the record, we conclude Mays failed in this respect both in his firm's initial contracting with Conley and when negotiating her claim.

We again review in more detail the events leading to the signing of Conley as a client. In fact, Conley's testimony reflects she was confused and dissatisfied with her legal representation beginning when she signed Mays's contract at the scene of her accident on July 18, 1994. She said that she did not know who Mason was or what she had signed. She thought the paper she signed was for Mason to investigate the accident and to authorize him to get information. Mays testified that he did not employ, nor did he know Tim Mason, even though Mason possessed Stevens's business card and the law firm's employment contract which Conley signed. Ray Keech, an investigator and process server hired by the Committee, testified that in his attempts to locate Mason he was given a phone number, which turned out to be that for Mays & Crutcher. When Keech called the number, the person answering indicated that Mason only came into the office about once a month.

Mays testified he later learned from his paraprofessional, Jimmy Morris, that Morris had given Mason a blank contract intended for another potential client, Bobby Jett, who lived in Pine Bluff. Morris had asked Mason to take the contract to Jett, who was interested in retaining the firm.[3] Mason apparently gave that contract to Conley. Mays testified that he would have had grave concerns if he had known how his contract had been entered into with Conley. Even so, it is clear Mays would not have learned of the contract by signing it, because Mays's agreement did not require his signature and had no place for him or any other attorney to sign. Also, he could not have been apprised of the circumstances surrounding the procurement of the contract because, as Mays conceded, he never met with Conley. Instead, it was Stevens who first contacted Conley by letter dated July 19, 1994, confirming the law firm had commenced work in Conley's behalf. That correspondence bears Mays's stamped signature. From this and other evidence, we believe the Committee could reasonably conclude that Mays had failed to supervise his non-lawyer staff personnel in meeting his fundamental obligations owed any new client, namely, to explain the parties' responsibilities under the contract, and to permit the client to ask questions and to make informed decisions regarding the representation.

We also note that there was substantial evidence that Mays had provided inadequate supervision over the manner in which his assistants negotiated Conley's claim. Mays testified that he monitored Conley's personal injury claim and evaluated it after receiving medical reports, bills, and wage-loss statements. He stated that he met with Stevens and Morris, and established a high and low range within which to settle. Mays said that Jimmy Morris had most of the contacts with Empire Insurance, and Stevens mostly dealt with Conley. Because Conley's injury was a "soft-tissue" injury and she had incurred medical expenses of $2,700.00 to $2,800.00, Mays said he set a settlement range between $6,500.00 and $10,500.00.

---

[3] Jett testified that he had spoken with Morris about Mays's law firm because Jett was dissatisfied with his lawyer. He said he expected to receive a contract from Morris, but never received one.

Contrary to Stevens's version, Conley testified that she had never told Stevens how much she wished to net and never authorized a settlement in any amount. Nonetheless, Mays stated that he had authorized settlement for $9,000.00 because he could make some money and satisfy Conley as well. Without obtaining Conley's approval, Morris called Traylor at Empire Insurance, and the Company sent Mays a check for $9,000.00. While Conley had advised Stevens she would not settle for the Company's offer, Conley was unaware the Company had sent a $9,000.00 check until months after she had terminated Mays's firm.

As confusion had resulted from Conley's signing of Mays's employment contract, confusion also arose during settlement negotiations of Conley's claim. It is obvious from the testimony that this confusion led to Mays extending a final offer to Empire Insurance without the offer having ever first been approved by Conley.

As addressed above, Mays, as supervising attorney, must bear the ultimate responsibility for the legal functions Stevens and Morris undertook. The Supreme Court of New Jersey, citing Ethical Consideration 3-6 of the *ABA Model Code of Professional Responsibility*, has noted:

> A lawyer often delegates tasks to clerks, secretaries, and other lay persons. Such delegation is proper *if the lawyer maintains a direct relationship with his or her client*, supervises the delegated work, and has complete responsibility for the work product.

*In re Opinion No. 24 of the Committee on the Unauthorized Practice of Law*, 607 A.2d 962, 967-68 (1992). (Emphasis added.) Mays's office procedures fostered confusion by permitting Stevens and Morris to act outside his close supervision. For example, these two paraprofessionals, when dealing with third parties, were authorized by Mays to refer to firm clients as their clients. In addition to being given broad authorization to use Mays's signature stamp and thereby act in Mays's stead, Mays also allowed Stevens to send correspondence to Empire Insurance referring to Conley as Stevens's client. Conley averred that she never understood how Stevens, rather than Mays, could advise her concerning

the "equities" of her claim or had the authority to correspond with the insurance company.

Also adding to Conley's confusion was that, while Conley knew of Stevens, she was wholly unaware of the role Morris played in the negotiations with Empire Insurance, and only learned of Morris's existence after the insurance company later told her it had settled Conley's claim with "Jim." Unlike with Stevens, Morris's name was never disclosed as an assistant on the law firm stationery.[4]

In sum, we must conclude, as did the Committee, that Mays failed to properly delegate his legal work and responsibilities and failed to properly supervise work delegated to his assistants. If he had, he would have been in the position at the least to have tried to resolve the questions that continued to resurface during his legal representation of Conley. For these reasons, we affirm the Committee's decisions.

---

[4] Stevens's name appeared on law firm stationery as a claims manager.