JUDICIAL DISCIPLINE and DISABILITY COMMISSION *v.*
Morris W. THOMPSON

99-1443 16 S.W.3d 212

Supreme Court of Arkansas
Opinion delivered May 10, 2000

258

*Gill, Elrod, Ragon, Owen, Skinner, & Sherman, P.A.,* by: *Marie-B. Miller, Judy P. McNeil* and *Chris L. Travis,* for petitioner Judicial Discipline & Disability Commission.

*Darrell Brown,* for respondent.

TOM GLAZE, Justice. This case involves an original action brought by the Arkansas Judicial Discipline & Disability Commission (Commission) against Judge Morris Thompson, recommending that Thompson be removed from office for having willfully violated the Canons of the Code of Judicial Conduct.

When Thompson was elected in November 1992 as Sixth Judicial Circuit Judge, Fifth Division, and took office on January 1, 1993, he was co-counsel representing Jacqueline Ford in a personal injury claim and Ada Gant (and other family members) in a wrongful-death suit. These claims were pending in Louisiana, and Judge Thompson remained involved in these two matters after he was judge. His involvement later led to a complaint being filed against him with the Commission.

During the Commission's investigation of the Ford and Gant complaint, other possible Code violations unfolded. After considerable discovery and responses were exchanged between the Commission and Judge Thompson, the nine-member Commission directed that three of its members conduct a hearing regarding the formal allegations filed against Judge Thompson, and it instructed the three-member panel to make its findings and recommendations to the full Commission. The hearing commenced on October 20 and ended on October 22, and following the hearing, on November 15, 1999, the panel made its findings and recommendations to the full Commission. The panel determined that convincing evidence showed that Judge Thompson had willfully violated the Canons of the Judicial Code, and had also violated Arkansas statutory law. The panel listed the following violations:

(1) When representing Ford in her personal injury case after January 1, 1993, Judge Thompson willfully violated Canon 4G of the Code by practicing law after he became a full-time judge. The same canon was violated by Judge Thompson when representing Ada Gant and others after January 1, 1993, in their wrongful death litigation.

(2) In connection with Ford's claim, Ford and Judge Thompson had executed a subrogation agreement with the Southern Council of Industrial Workers (Southern Council) for medical expenses paid on Ford's behalf, and, contrary to Canons 1 and 2A of the Code, Judge Thompson willfully failed to honor the agreement.

(3) Judge Thompson willfully violated Canons 4A, D, H, and I and Ark. Code Ann. §§ 21-8-203 and -204(b)(1) (Repl. 1996), by failing to properly file reports of outside income on the financial interest statement required to be filed with the Secretary of State.

(4) Judge Thompson willfully violated Canons 1 and 2A of the Code by writing fifty-nine insufficient checks between 1993 and 1997.

(5) Judge Thompson further violated Canons 1 and 2A by failing to pay his federal income taxes, even though he had received sufficient income to pay them.

(6) Judge Thompson violated Canons 1 and 2A and Ark. Code Ann. § 16-10-410(b)(3) (Repl. 1999), when he violated Ark. Code Ann. § 27-14-306 (Repl. 1994), by placing the license tag belonging to his 1981 Toyota on his Ford pickup truck.

The Commission additionally requests that we consider a seventh point: Whether Judge Thompson violated Rule 1.15 of the Model Rules of Professional Conduct because he deposited client funds in his "operating account," rather than a "trust account." Considerable testimony was taken on this point, but no specific mention of it is made in the Commission's findings. Judge Thompson concedes that we have the authority under Rule 12D of the Rules of Procedure of the Arkansas Judicial Discipline & Disability Commission (1999), to consider whether he violated Rule 1.15, since we are considering his removal. Thus, we will address the Rule 1.15 argument, as well.

On December 9, 1999, the full Commission reviewed the panel's six findings of fact and its recommendations, and unanimously concluded that the facts were proven by clear and convincing evidence, that Judge Thompson willfully violated Canons 1, 2A, 4A, 4D(2), 4G, 4H, and 4I of the Code, and that such violations were prejudicial to the administration of justice. The Commission further stated that, while some of the offenses and findings, standing alone, may have warranted a lesser sanction, the seriousness of the others, along with the sheer number of violations committed over such a lengthy period of time, left no other alternative than to recommend Judge Thompson's removal from office.[1]

---

[1] One Commission member joined in the Commission's recommendation that Judge Thompson should be removed, but stated that, while the Commission member agreed that all the violations had occurred, he did not believe Judge Thompson's failure to honor Southern Council's subrogation agreement or his failure to pay his federal income tax violated Canons 1 and 2A.

■ After the Commission entered its findings and recommendations, it filed them and its record with this court, and the matter was docketed for expedited consideration. *See* Rule 12 of the Discipline and Disability Rules (1999). The Commission and Judge Thompson have now filed their briefs,[2] participated in oral argument, and the case is submitted to us for decision. Upon review of the entire record, we may accept, reject, or modify, in whole or in part, the Commission's findings and recommendations. Rule 12E. In short, our standard of review in this matter is one of de novo review, and we will not reverse the Commission's findings unless they are clearly erroneous. *See* Ark. R. Civ. P. 52(a); *cf. Mays v. Neal*, 327 Ark. 302, 938 S.W.2d 830 (1997), and *Finch v. Neal*, 316 Ark. 530, 873 S.W.2d 519 (1994). In considering the Commission's findings and recommendations and Judge Thompson's responses to them, we will review each of the seven violations argued and set out above. Judge Thompson also raises several due process issues regarding the three-member panel, including an evidentiary ruling it made. We will discuss those matters after discussing and deciding the substantive findings.

> I. Whether Judge Thompson violated Canon 4G of the Judicial Code by engaging in the practice of law after he assumed the bench on January 1, 1993.

■■ Canon 4G provides that a judge shall not practice law or appear in any court within this state, and the commentary to this Canon notes that the prohibition "refers to the practice of law in a representative capacity under Ark. Const. art. 7, § 25."[3] However, Judge Thompson relies on the Canon's language, "shall not practice . . . in any court within this State," and argues this phrase is not defined by the Judicial Code, and he does not fall within its prohibition. He claims that he never appeared as counsel in any court, nor did he practice law within Arkansas. Thompson further cites an

---

[2] An individual amicus, who is an elector residing in the sub-district from which Judge Thompson was elected, filed a brief in this appeal. The amicus brief does not address the findings or arguments raised, but appears largely to caution or remind the court that any decision that displaces an elected judge will impact innocent parties (voters). The amicus brief also alludes to the consent decree entered in the federal district court case, *Hunt v. State*, No. PB-C-89-406 (E.D. Ark. 1991).

[3] We note the commentary mistakenly refers to art. 7, § 24. It is art. 7, § 25 which provides that judges of the supreme, circuit, or chancery courts shall not, during their continuance in office, practice law or appear as counsel in any court, State or Federal, within this State.

Oregon case, *In Re Piper*, 534 P.2d 159 (Or. 1975), and advisory opinions from Florida, New York, and Kentucky for the proposition that an attorney elected to a judgeship may complete his or her legal work after assuming the bench. While we harbor considerable doubt that the authority cited by Judge Thompson is on all fours with the case here, we need not explore those situations in other jurisdictions because not only does our law specifically prohibit the practice of law by judges, but this court has also defined and decided what is meant by, and is included within, the term "practice of law." In *Undem v. State Board of Law Examiners*, 266 Ark. 683, 587 S.W.2d 563 (1979), this court stated the following:

> It is quite true that *the practice of law is not confined to services* by an attorney *in a court of justice; it also includes any service of a legal nature rendered outside of courts* and unrelated to matters pending in the courts. (Citations omitted.) It is uniformly held that writing and interpreting wills, contracts, trust agreements, *and the giving of legal advice in general constitute practicing law*. (Emphasis added.)

In concluding that, under Arkansas law, a judge cannot practice law after he is elected to and assumes the bench, we now review the evidence bearing on whether Judge Thompson's activities after he took office on January 1, 1993, involved the practice of law.

■ Regarding the Ford case, Judge Thompson served as co-counsel with Brenda Brown, a Louisiana attorney. Thompson submits that he advised Ford concerning settlement, and she accepted a settlement offer in December 1992. He argues that all the work performed after December 1992 was "clerical" and did not fall within the proscription of "practicing law." The evidence presented to the Commission failed to support Judge Thompson's claim. For example, between January 4 and 13 of 1993, opposing defense counsel, Bruce M. Mintz, sent Judge Thompson a receipt and release for Ms. Ford and her husband to sign and for Thompson to approve as their attorney; included, too, was a motion and order of dismissal with prejudice which Judge Thompson was requested to approve as one of the Fords' attorneys. Mintz also enclosed a check dated January 4, 1993, in the amount of $150,000.00. On January 13, 1993, Judge Thompson met with the Fords in his judge's chambers where they discussed and signed and approved the above documents, and afterwards, Thompson accompanied the Fords when they negotiated the check. On January 19, 1993, Judge Thompson faxed a letter to his Louisiana co-counsel Brenda

Brown, confirming their fee arrangement, and the next day he sent Brown a cashier's check along with a letter, written on his judicial stationery, wherein he directed Brown to approve the order of dismissal and gave her directions on closing the case. Unquestionably, these activities that took place in Arkansas involved legal advice, and the documents identified him as the Fords' attorney. Judge Thompson's actions in bringing the Fords' case to a resolution easily fall within the definition of practicing law, and the Commission's decision so finding is correct.

When investigating the Ford matter, the Commission discovered Judge Thompson had also continued to represent Ada Gant and other family members concerning their wrongful-death case filed in Louisiana. While Judge Thompson disputes many of the Commission's allegations and findings that resulted in the Commission's decision that he willfully violated Canon 4G by continuing to practice law on the Gants' behalf after January 1, 1993, there is clear and convincing evidence that he did, indeed, represent the Gants as their co-counsel as late as November 1994 — one year and eleven months after being sworn in as a judge.

■ It is undisputed that, on December 30, 1992, Judge Thompson participated in several depositions involving the Gant case. Thompson and his Louisiana co-counsel Brenda Brown and Pamela Blankenship represented the Gants, and Louisiana attorneys David Nelson and Haynes Harkey represented the defendants. After the depositions ended, the attorneys discussed settlement. After Harkey returned to his office, he claimed, and later testified, that Judge Thompson informed Harkey that he had received "special dispensation" from a "senior judge" that would allow him to finish the Gant case. Harkey further averred that he memorialized that conversation by memorandum to associate defense counsel, Bruce Mintz, in order to summarize what had transpired on the day of the depositions. The Commission apparently believed Harkey's version of what was said. That being true, since Arkansas's judicial branch has no trial judge denominated as "senior judge" who could give such dispensation, the Commission could have reasonably concluded that Judge Thompson offered a false cover to give a reason why, as a newly elected judge, he intended to represent the Gants until the conclusion of their case.

Although Judge Thompson urges that he had advised opposing counsel that he would no longer be involved in the case, the evidence undermines that assertion. Judge Thompson testified that he closed his law office in December 1992, and sent his motion to withdraw as an attorney in the Gant case to his co-counsel. Nonetheless, that motion was never filed with the Louisiana court, and the evidence shows that Judge Thompson continued to participate until the Gant case's conclusion.[4] In fact, the record reflects that legal correspondence and documents concerning the Gant case continued to be exchanged between Judge Thompson, opposing counsel, and the Louisiana court's clerk between January 1993 through October 1994. Defense counsel Mintz testified that she was sure she did not receive any written or verbal communication that Thompson no longer represented the Gants or Fords after he took the bench. Defense counsel David Nelson also could not recall Judge Thompson saying he was no longer involved in the Gant case.

On March 17, 1993, Mark Ackley, an adjuster for defendant St. Paul Fire & Marine Insurance Company, called Judge Thompson at his judicial office, after Ackley was unable to contact Blankenship; during the call, Ackley and Judge Thompson discussed proposed settlement of the Gant matter. Ackley sent Judge Thompson a fax setting out the settlement terms, and the fax was directed to "Judge Thompson." Ackley said that, in his conversation with Thompson, Thompson never told him that he could not settle the case; nor did he refer Ackley to another attorney. Ackley said the Gant case was settled on March 24, 1993, and co-counsel Blankenship signed Thompson's name along with her own on the release documents, which the evidence shows Judge Thompson gave Blankenship authority to do. Thompson signed this signature authorization as "Judge Morris Thompson" and had mailed it to defense attorney Bruce Mintz. Prior to the signing and approval of the March 31 release, Judge Thompson had written and disbursed checks to his clients, but he advised his clients not to negotiate the checks until he received the settlement check and it had cleared his account. These checks were written on Judge Thompson's "operating account" at Union National Bank. Although Judge Thompson argues he did not deal with these clients and disputes these findings

---

[4] Co-counsel Pamela Blankenship stated that she did not file Judge Thompson's motion because she thought it would disrupt negotiations. Blankenship did discharge her other co-counsel, Brenda Brown, in the Gant case.

made by the Commission, Thompson's own testimony concedes their verity when he acknowledged the clients had negotiated checks written on his account. Moreover, the operating account used by Judge Thompson contained the legend, "Morris W. Thompson P.C. Law Firm."

■ In April 1993, Judge Thompson received a $150,000 settlement check. He, Blankenship, and their clients endorsed the check, and Judge Thompson deposited the check in his operating account. Judge Thompson paid the court reporters and his co-counsel their expenses and fees, and he also sent a check to the Louisiana court clerk to cover future costs in the Gant lawsuit. The record further reflects that Judge Thompson still had contact with co-counsel Blankenship and opposing counsel Nelson after the March and April activities involving the Gant matter. In this respect, Judge Thompson contacted Blankenship on about twenty occasions between August 14, 1993, and November 4, 1994, and he spoke with defense attorney Nelson on November 29, 1993. As we similarly concluded above regarding the Ford case, we believe the record also amply supports the Commission's finding that Judge Thompson practiced law when he continued to represent the Gants after he ascended to the bench on January 1, 1993.

■ Judge Thompson argues that, even if he violated Canon 4G, he did not do so willfully. In short, Judge Thompson submits that he made a good-faith interpretation of Canon 4G, and, in doing so, believed he could finish his law practice after he took office. He urged before the Commission, and argues here, that he reached the opinion that he could perform clerical activities in order to complete his law practice. However, as we have already concluded, our review of the work he performed revealed he was performing more than ministerial or clerical acts, but instead, his actions constituted the active practice of law, which is clearly prohibited under Ark. Const. art. 7, § 25, and Canon 4G. In addition, we cannot ignore the testimony of opposing counsel Haynes Harkey, who said Judge Thompson had received "special dispensation" from a "senior judge" who allowed him to finish the Gant case. The Commission had the right to believe Harkey's testimony as being true, and because no such dispensation procedure is permitted in Arkansas, it could further reasonably infer that Judge Thompson's false statement to Harkey was offered to explain or justify his unlawful practice of law.

II. Whether Judge Thompson violated Canons 1 and 2A by failing to honor the subrogation contract he and Ms. Ford executed with the Southern Council of Industrial Workers.

Canon 1 and 2A of the Code of Judicial Conduct read as follows:

*Canon 1. A judge shall uphold the integrity and independence of the judiciary.*

An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining and enforcing high standards of conduct, and shall personally observe those standards so that the integrity and independence of the judiciary will be preserved. The provisions of this Code are to be construed and applied to further that objective.

*Canon 2. A judge shall avoid impropriety and the appearance of impropriety in all of the judge's activities.*

A. A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.

During his representation of Ms. Ford, both Judge Thompson and Ford executed a subrogation agreement with Southern Council on September 3, 1991, whereby the Council paid for the medical treatment or services Ford incurred. These monies were paid from the Council's Industrial Workers Health and Welfare Fund, and Judge Thompson and Ford agreed to reimburse the fund for any recovery. As already mentioned above, Judge Thompson settled Ford's claim in December 1992 and January 1993 for $150,000.00, but neither Judge Thompson nor Ford reimbursed Southern Council's fund. In fact, Judge Thompson kept $50,000.00 of the recovery as attorney's fees. Southern Council filed suit in federal court against Judge Thompson and Ford, and it obtained a judgment in the amount of $29,971.00. The federal court ruled that Judge Thompson had intentionally exercised control over funds inconsistent with Southern Council's rights and held that he converted the Council's funds. Judge Thompson did not appeal that determination, but instead argued that, in defending against Southern Council's lawsuit, he had simply believed that the obligation owed Southern Council belonged to Ford, not him. However, such an explanation fails to explain how he could have avoided responsi-

bility for the debt when he joined in signing the agreement to reimburse the Council. Nor does Judge Thompson satisfactorily address and rebut the federal court's decision finding a knowing conversion on his part, which was not appealed. Based on this evidence, we are unable to say the Commission was clearly erroneous in finding Judge Thompson violated Canons 1 and 2A.

III. Whether Judge Thompson willfully violated Canon 4 of the Code of Judicial Conduct and Ark. Code Ann. §§ 21-8-203 and -204(b)(1) (Repl. 1996), by failing to properly report his outside income and financial interests to the clerk of the Arkansas Supreme Court and the Secretary of State.

Canon 4H(2) provides as follows:

(2) *Public Reports.* A judge shall report the date, place and nature of any activity for which the judge received compensation, and the name of the payor and the amount of compensation so received. The judge's report shall be made at least annually and shall be filed as a public document in the office of the Clerk of the Supreme Court.

The commentary to Canon 4I refers to the foregoing canon, stating in pertinent part that Section H requires a judge to report all compensation the judge receives for activities outside judicial office. The Commission found, and Judge Thompson does not dispute, that Judge Thompson did not report or list the attorney's fees he received in 1993 from the Ford and Gant settlements, nor did he list the following attorney's fees or income he received in 1993 from other attorneys or clients: Marvin L. Harris (approximately $8,431.00), Woodson Walker referral fees ($4,956.96), Willard Proctor referral fees ($3,865.68), and income from Willard Proctor from the Fred Douglas Trust ($4,596.56).

The Commission further found Judge Thompson failed to report other outside income he received between January and December of 1994; that compensation was the following:

(1) Attorney's fees received from James Rhodes in the amount of $4,586.00.

(2) Attorney's fees received from Willard Proctor in the amounts of $2,016.00, $6,060.25, and $6,849.31.

(3) Attorney's fees from the Arkansas Municipal League in the sum of $5,400.00.

(4) Attorney's fee from the Needham, Johnson, Lovelace, and Johnson Law Firm in Texas in the amount of $160,000.00.

The Commission finally concluded on this point that Judge Thompson failed to file any outside-income report with this court's clerk in 1996, nor did he file a statement of financial interest with the Secretary of State in 1996 as required by Ark. Code Ann. §§ 21-8-203 and -204 (Repl. 1996). Section 21-8-203 emphasizes the purpose of disclosure-of-income requirements, providing such reports are essential to the efficient operation of government and to minimize the opportunities for conflicts of interest. Ark. Code Ann. § 21-8-202 (Repl. 1996) imposes a fine of up to $500.00 for the failure to file an income report and designates the violation of §§ 21-8-203 and -204 to be a misdemeanor.

██ ██ While Judge Thompson seems to argue that Canon 4H's reporting requirements are ambiguous, we believe they are quite clear — a judge *shall*, at least annually, report the date, place and nature of any activity for which he or she received compensation and report the amount and the person who paid the compensation. The preamble of the Judicial Code instructs that when the Code uses "shall" or "shall not," it is intended to impose binding obligations, the violation of which can result in disciplinary action. Filing such information allows interested persons and the public to have knowledge concerning whether a judge has any conflicts of interest when the judge conducts judicial business. Although Judge Thompson refers us to a Michigan State Bar advisory opinion that suggests a new judge need not disclose payments from his or her former law firm, so long as the payments are made with respect to work done when the judge was still in practice, such is not legal precedent, but more importantly, the opinion, as set out, is wholly inconsistent with the language and purposes of Canon 4H adopted by our court and the Arkansas law embodied in §§ 21-8-203 and -204.

IV. Whether Judge Thompson violated Canons 1 and 2A of the Code of Judicial Conduct, by issuing insufficient checks on his operating account for the purchase of goods, services, and the payment of debts.

Judge Thompson argues that, while he did not watch his account as closely as would have been prudent, he only had twenty-one checks returned as insufficient. He also asserts that, contrary to the Commission's finding, he had overdraft protection.

First, in reviewing the record, we read Judge Thompson's own testimony where he admitted on direct examination that fifty-nine checks had been returned to him as insufficient between 1993 and 1997. He also agreed that his ability to sit on cases involving "hot checks" had been compromised. Second, although he claims to have had overdraft protection, bank officials disagreed. Obviously, the best proof on this point is that fifty-nine checks were returned insufficient over a five-year period, and no overdraft protection was extended to make those checks good. Third, other evidence presented to the Commission showed what could be labeled a willfulness on Judge Thompson's part in failing to satisfy those businesses that received his insufficient checks. For example, he gave a check to Pop-a-Top Liquor in the amount of $15.16 which was returned for insufficient funds. The store owner said that he tried to contact Judge Thompson by telephone and mail, but received no response until the store contacted the prosecuting attorney, seeking an arrest warrant. Judge Thompson paid the debt only after the prosecuting attorney's office contacted him. In addition, Judge Thompson wrote an insufficient check to Sam's Wholesale Club for the amount of $317.29. A Sam's representative averred the store called Judge Thompson's home number four times and got no answer. The last two calls revealed Judge Thompson's phone had been disconnected, so Sam's sought an arrest warrant, and like the case with Pop-a-Top, Judge Thompson paid only after the prosecuting attorney's office notified him that an affidavit for an arrest warrant had been filed.

■■ Although judges should be independent, they must comply with the law, including the provisions of Arkansas's Judicial Code. *See* commentary to Canon 1. Public confidence in the impartiality of the judiciary is maintained by the adherence of each judge to this responsibility, and conversely, violation of the law and the Code diminishes public confidence in the judiciary and thereby does injury to the system of government by law. Again, we conclude the record before us supports the Commission's findings showing Judge Thompson violated the Code by his issuing insufficient checks as described above. *Cf. Arkansas State Police Comm'n v.*

*Smith*, 338 Ark. 354, 994 S.W.2d 456 (1999) (where Officer Smith admitted he wrote checks to merchants without knowing how much money was in his account at the time, that he received notice of the returned checks, and that he failed to rectify the wrongs suffered by the merchants without judicial intervention, the Commission's termination of Smith was supported by substantial evidence).

> V. Whether Judge Thompson violated Canons 1 and 2A of the Code of Judicial Conduct, by failing to pay his 1994 federal personal income tax.

The Commission found that, on October 28, 1996, Judge Thompson was assessed $86,936.91 as delinquent federal income tax for the year ending 1994, and the Internal Revenue Service filed a notice of Federal Tax Lien on Judge Thompson and his wife. The Commission found Judge Thompson's failure to pay his income taxes violated the Code because he had the money in 1994 to pay the taxes, but chose not to do so. In support of its findings, the Commission found Judge Thompson had received a referral fee in 1994 in the amount of $160,000.00 but placed $100,000.00 in a Merrill Lynch account and used the balance to pay other debts rather than his taxes.

Judge Thompson's sole response on appeal is that he made his decision to utilize his resources to pay off "old pressing financial obligations" and to pay his tax obligation by installment. On this point, Judge Thompson would be correct, at least to the extent that, if he had insufficient funds to pay all his debts, he should be able to schedule the best debt-payment plan he could. However, Thompson does little in the way of argument to point to evidence that rebuts the Commission's findings that he had suffi-cient funds to pay his 1994 taxes. It is especially noteworthy that Judge Thompson had $100,000.00 to put in a Merrill Lynch account. In reviewing his testimony before the Commission, Judge Thompson merely said that, when he told the IRS of his assets and liabilities, he "imagined" the IRS knew he had the account. While this non-payment of federal income tax issue is a close one, we are not inclined to set aside the Commission's findings that Thompson's conduct violated Canons 1 and 2A. We do note at this stage that, if this issue was the only violation before us, it would not be one that would invoke a sanction for removal from office.

VI. Whether Judge Thompson violated Canons 1 and 2A, by operating a motor vehicle with a fictitious license plate tag.

On June 18, 1997, Judge Thompson was stopped by the police and given a citation for exhibiting a fictitious license plate tag in violation of Ark. Code Ann. § 27-14-306 (Repl. 1994), a misdemeanor. Judge Thompson admitted he placed a license plate tag from a 1981 Toyota on his 1982 Ford pickup truck. However, he said that he was restoring the truck and only drove it to the mechanic shops or garages for needed work. While Judge Thompson urges that he made no attempt to deceive anyone concerning his judicial status, the purpose for attaching the fictitious license tag was to mislead law enforcement officers to believe the truck was properly registered. Such misconduct on Judge Thompson's part clearly violated Canons 1 and 2A.

VII. Whether Judge Thompson violated Rule 1.15 of the Model Rules of Professional Conduct, by depositing client funds in a personal account rather than an identifiable trust account.

While the Commission did not directly consider this issue, both Judge Thompson and the Commission agree we can do so when considering the removal of a judge.[5] Rule 12D of the Judicial Discipline and Disability Rules provides as follows:

D. *Scope of Discipline.* The Supreme Court, when considering removal of a judge, shall determine whether discipline as a lawyer also is warranted. If removal is deemed appropriate, the court shall notify the judge, the Commission and the Supreme Court Committee on Professional Conduct and give each an opportunity to be heard on the issue of the imposition of lawyer discipline.

Model Rule 1.15 is the rule we are asked to consider, and it reads in pertinent part as follows:

(a) All lawyers shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property.

---

[5] Judge Thompson's failure to comply with Model Rule 1.15 comes within Canon 2A, especially since he violated the Arkansas Constitution and Canons when he continued to practice law after he ascended to the bench. Accordingly, Judge Thompson's and the Commission's agreement to consider this issue on appeal is appropriate.

(1) Funds of a client shall be deposited and maintained in one or more identifiable trust accounts in the state where the lawyer's office is situated, or elsewhere with the consent of the client or third person. The lawyer or law firm may not deposit funds belonging to the lawyer or law firm in any account designated as the trust account, other than the amount necessary to cover bank charges, or comply with the minimum balance required for the waiver of bank charges.

It is undisputed that, sometime after January 1993, Judge Thompson allowed his attorney's trust account to elapse, but he maintained a personal or what he specifically referred to as an "operating account" in order to "clean up" his debts.

In handling the Ford and Gant settlements, Judge Thompson conceded that he deposited the settlement checks or drafts in his operating account, and disbursed checks to his clients. However, Judge Thompson suggested his failure to use a trust account to deposit the Ford and Gant funds was not his usual practice, and he only did so to complete his prior law business. On cross examination, however, Judge Thompson was shown a number of checks made out to him and other clients prior to when he took office. The checks bore the names of Bertha Chambers, Vivian Lamini, Gertie Mason, Irma Reshada, Diana Cross, and Diana Brickman, and he admitted those checks were deposited in his operating account and he had "technically" commingled his clients' monies with his. Based on this evidence and Judge Thompson's admissions, we must conclude that he violated Model Rule 1.15, and such violation will be considered by this court in the Commission's recommendation to remove Judge Thompson from office.

We have thoroughly discussed and decided the seven findings and Code violations the Commission has made, but before we address the Commission's recommendation bearing on Judge Thompson's removal, we must consider Thompson's due process arguments.

Thompson first contends that his due process rights were violated because his discipline hearing was held before a three-person panel rather than the full nine-member Commission. Citing *Mathews v. Eldridge*, 424 U.S. 319 (1976), he argues generally that procedural due process requires a hearing before an impartial decision maker be provided at a meaningful time and in a meaningful

manner, prior to a governmental decision which deprives individuals of a liberty or property interest. He suggests that he was not offered a fair opportunity to be heard at a meaningful time or manner because all nine members did not hear the evidence first hand. He also claims he was somehow prejudiced because five of the nine Commission members, due to their term expirations, had departed the Commission, so their replacements on the Commission (when the Commission made its final findings and recommendations) were not present earlier when the probable cause and factfinding hearing rulings were made. In other words, Thompson says he was denied a fair and meaningful hearing because the five new commissioners were not privy to all of the proceedings that previously had transpired in his case.

The Commission rejoins by stating Judge Thompson has no protected property interest in the judicial office he holds, so due process is not an issue. Although we do not totally agree with the Commission's response, we do agree that neither Judge Thompson nor the Commission offers sufficient citation of legal authority or convincing argument for us to decide this question. *See Womack v. Foster*, 340 Ark. 124, 8 S.W.3d 854 (2000); *Ellis v. Price*, 337 Ark. 542, 990 SW.2d 543 (1999). In oral argument, Judge Thompson agreed that he had no legal authority suggesting the three-member panel hearing utilized by the Commission in any way violated procedural due process. We are not inclined to delve into this legal issue without briefs and argument that better develop this issue.

Suffice it to say, Rule 11C provides for a formal disciplinary hearing before the full Commission, or a three-member panel as a factfinder, and Rule 11D states that the proceeding shall be recorded verbatim. If a panel conducts the hearing, it must submit its findings and recommendations, together with the record and transcript to the full Commission. *See* Rule 11D and F of the Discipline and Disability Rules. And when the panel is the factfinder, the full Commission may make findings of fact independent from those offered by the panel. *Id.* at F. Such procedure ensures that the full Commission has before it all of the record of the formal proceedings, and each member is reserved the power to review the disciplinary proceeding and reach findings separate from those made by the panel.

██ Judge Thompson next asserts that his due process rights were violated when the Commission considered allegations that were not part of the formal statement of charges. He argues that, after his probable cause hearing, the Commission dismissed several evidentiary issues later utilized to support some of the Commission's findings and recommendations. However, he fails to show when or where in the record these dismissals appear, and we are unable to find them through our independent search. In short, Judge Thompson has failed to preserve this argument. *See Western Foods, Inc. v. Weiss*, 338 Ark. 140, 992 S.W.2d 100 (1999); *Brown v. Arkansas State (HVACR) Licensing Bd.*, 336 Ark. 34, 984 S.W.2d 402 (1999). However, even if the record reflected such dismissals, he has not shown how they would have prejudiced his case, since other evidence presented to the Commission amply supports the Commission's findings.

Judge Thompson's final due process argument is that Circuit Court Judge David Bogard and all other circuit court judges serving in the Sixth Judicial Circuit had disqualified themselves when they were requested to preside on earlier cases involving Judge Thompson. One case was about four years ago and involved a wholly different matter than the case now before us. The second case was filed by Judge Thompson to prevent the Commission's discovery requests during its investigation of Thompson which led to the filing of the disciplinary proceeding now before us. Judge Bogard was appointed to the Commission after these earlier cases, but when Judge Bogard and the two other Commission panel members commenced the formal discipline hearing in this matter, Judge Thompson raised the possibility of Judge Bogard's disqualification. He suggested to Judge Bogard that, since Bogard had previously recused in other cases involving Judge Thompson, he might wish to do so in this proceeding. Judge Bogard rejected Judge Thompson's suggestion, stating that, in the earlier situations, he merely felt uncomfortable in sitting as a presiding judge on a friend's and co-worker's case, and Judge Bogard considered Judge Thompson both. In retrospect, Judge Bogard said that he "might not have disqualified," because his earlier recusals were not ones based on a feeling that he could not be impartial or unbiased. Judge Bogard posited that, unless the Commission had some concern over his prior favorable relationship with Judge Thompson, Bogard believed that he could be fair to both parties. The Commission offered no objections.

Judge Thompson cites Canon 3E(1) of the Code of Judicial Conduct which in relevant part provides that a judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned. Judge Thompson argues simply that Judge Bogard's prior recusals called Judge Bogard's impartiality into question; therefore, he should be disqualified.

 This court has held that, in cases where judges have been asked to disqualify, judges are presumed to be impartial, and the person seeking disqualification bears a substantial burden in proving otherwise. *See Ayers v. State*, 334 Ark. 258, 975 S.W.2d 88 (1998); *Turner v. State*, 325 Ark. 237, 926 S.W.2d 843 (1996). We have further held that the decision to recuse is within the trial judge's discretion, and it will not be reversed absent abuse. Here, Judge Bogard took the time to explain why he had previously recused from sitting on prior matters involving Judge Thompson, that those reasons did not include any bias or impartiality he had towards Judge Thompson, and that he had a fair and open mind and heart that would permit him to participate as a panel member in the case. After Judge Bogard's declarations, Judge Thompson presented no evidence to show or prove bias on Judge Bogard's part or that Judge Bogard in any way abused his discretion in deciding not to recuse. Thus, we uphold Judge Bogard's ruling on this issue.

In disposing of Judge Thompson's due process arguments, we turn finally to Judge Thompson's last separate point where he asserts that the three-member panel erred by allowing Denny Reynaud, the Commission's investigator, to testify to what Judge Thompson argues was inadmissible hearsay evidence.

 The Commission called Reynaud as a witness, and he began his testimony by saying the Commission had received a letter from an attorney named Mary Thomason, who alleged that Judge Thompson was practicing law without a license. Thomason represented Mrs. Ford in the federal lawsuit in which Southern Council sued Ford and Judge Thompson, as co-defendants, alleging they failed to honor their subrogation agreement. Judge Thompson objected to Reynaud's reference to Thomason's statements as being hearsay and that such testimony prejudiced Judge Thompson by attempting to use Reynaud's testimony to prove the matters asserted by Thomason. We do not agree. The Commission offered Reynaud's testimony to show only that it was Thomason's letter that

caused the Commission to initiate an investigation into whether Judge Thompson represented Ford before and after he assumed the bench. The panel correctly overruled Judge Thompson's objection, since, contrary to Thompson's assertion, the Commission did not offer Thomason's letter or statements to prove Judge Thompson was practicing law improperly, but instead to show why it initiated an investigation into whether Judge Thompson was improperly practicing law. *Wal-Mart Stores, Inc. v. Dolph,* 308 Ark. 439, 825 S.W.2d 810 (1992); *see also* Ark. R. Evid. 801(c) (1999). As fully discussed above, Judge Thompson did unlawfully practice law not only by representing Ms. Ford, but also by representing Gant and others as well.

In conclusion, we now consider the Commission's recommendation that Judge Thompson's Code infractions compel his removal from office. The Commission stated its recommendation as follows:

> While some of the offenses set forth above may have warranted a lesser sanction as an isolated event, the seriousness of some of the other offenses as well as the sheer number of violations committed over such a lengthy period of time, leave no other alternative than to recommend to the Supreme Court of Arkansas that Respondent, Morris W. Thompson, be removed from office as Circuit Judge of the Sixth Judicial Circuit, Fifth Division, of the State of Arkansas.

In our de novo review as set out above, we have emphasized that evidence which convincingly proved Judge Thompson had violated the Judicial Code, the Arkansas Constitution, and Arkansas statutory laws. Judge Thompson, on the other hand, has repeatedly taken the position that he made a good-faith and reasonable interpretation of these controlling canons and laws, and his interpretations negated any suggestions that he violated these provisions "willfully." Consequently, Judge Thompson argues we should reject the Commission's recommendation for his removal from office. Alternatively, he urges the imposition of the lesser sanction of reprimand.

Much of Judge Thompson's argument is disturbing and somewhat difficult to follow. While he denies any willful or intentional violation of the canons or laws, the record clearly shows he knowingly violated misdemeanor laws when he utilized fictitious license tags to his personal advantage and caused the prosecuting attorney's

office to persuade him to pay insufficient checks. Also, while he claims his good faith attempt to comply with other Code violations with which he was charged, the evidence clearly undermines such argument. As previously stated, Arkansas constitutional law prohibits judges from "practicing law," and Arkansas case law has clearly defined that term to include the actions taken by Judge Thompson in this case. Nonetheless, Judge Thompson never sought legal advice on this point, but instead followed his own favorable view of the law. In doing so, he not only continued to represent clients, he also conveyed an erroneous explanation to an opposing counsel that he had received special dispensation from a senior judge to finalize his law practice. It is fair to say that each time Judge Thompson had a question regarding the canons or law, he held his own counsel and decided that his actions were lawful or permissible in the circumstances.[6] As pointed out earlier, when the text of the Judicial Code uses "shall" or "shall not," it is intended to impose "binding obligations." However, when Judge Thompson was confronted with Canon 4's mandate that he file a public report listing compensation from extra-judicial activities, he rejected its application to his special circumstance. Finally, we note Judge Thompson offered a self-serving interpretation of why he refused to honor his and his client's subrogation agreement with Southern Council, but that interpretation totally ignores the federal judge's decision that Judge Thompson knowingly converted the Council's funds and the fact that no appeal was taken from that decision.

██ We believe the Commission's recommendation that Judge Thompson should be removed is the right one. It is not unlike the decision handed down recently in *Disciplinary Proceedings Against Anderson*, 981 P.2d 426 (Wash. 1999). There, the Supreme Court of Washington, in determining the appropriate sanction for judicial misconduct, considered the following:

> (a) whether the misconduct is an isolated instance or evidenced a pattern of conduct;

> (b) the nature, extent and frequency of occurrence of the acts of misconduct;

---

[6] Besides his ability to seek legal advice from counsel, Judge Thompson also could have requested advice from the Judicial Ethics Advisory Committee under Section 5 of Act 791 of 1991.

(c) whether the misconduct occurred in or out of the courtroom;

(d) whether the misconduct occurred in the judge's official capacity or in his private life;

(e) whether the judge has acknowledged or recognized that the acts occurred;

(f) whether the judge has evidenced an effort to change or modify his conduct;

(g) the length of time of service on the bench;

(h) whether there have been prior complaints about this judge;

(i) the effect the misconduct has upon the integrity of and respect for the judiciary; and

(j) the extent to which the judge exploited his position to satisfy his personal desires.

In concluding its review of Judge Anderson's case, the Washington Supreme Court ordered his removal for (1) continuing to serve as president of three corporations for ten months after being sworn in as judge, (2) continuing to participate in the sale of a business belonging to the estate of a deceased client, (3) and failing to report loan payments on his vehicle made by a personal friend to whom the business had been sold.[7]

Once again, the record reflects that Judge Thompson, in each circumstance involved, relied on his own legal interpretation of the canon and law involved, and without exception, he chose the option which benefited or was most favorable to him. Even at this stage, Judge Thompson fails to accept responsibility for those acts that conflicted with any of the canons or laws in issue. The preamble of the Judicial Code undergirds and compels this court to establish a high standard when reviewing a judge's misconduct and to ensure its fair and uniform compliance. The preamble in relevant part provides the following:

---

[7] In ordering Judge Anderson's removal, the Washington court actually rejected the recommendation of the Washington Commission on Judicial Conduct that the judge be censured and suspended without pay for four months.

Our legal system is based on the principle that an independent, fair and competent judiciary will interpret and apply the laws that govern us. The role of the judiciary is central to American concepts of justice and the rule of law. Intrinsic to all sections of this Code are the precepts that judges, individually and collectively, must respect and honor the judicial office as a public trust and strive to enhance and maintain confidence in our legal system. The judge is an arbiter of facts and law for the resolution of disputes and a highly visible symbol of government under the rule of law.

\* \* \*

The text of the Canons and Sections is intended to govern conduct of judges and to be binding upon them. It is not intended, however, that every transgression will result in disciplinary action. Whether disciplinary action is appropriate, and the degree of discipline to be imposed, should be determined through a reasonable and reasoned application of the text and should depend on such factors as the seriousness of the transgression, whether there is a pattern of improper activity and the effect of the improper activity on others or on the judicial system.

The Code of Judicial Conduct is not intended as an exhaustive guide for the conduct of judges. They should also be governed in their judicial and personal conduct by general ethical standards. The Code is intended, however, to state basic standards which should govern the conduct of all judges and to provide guidance to assist judges in establishing and maintaining high standards of judicial and personal conduct.

For these reasons, we hereby order Judge Thompson's removal from office. Pursuant to Rule 12D of the Rules of Procedure of the Arkansas Judicial Discipline and Disability Commission, we also forward a copy of this opinion to the Supreme Court Committee on Professional Conduct for a hearing on the issue of imposition of lawyer discipline.

IMBER, J., not participating.